IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANGELA SCOTT FERENCIN,        :
                                       :
                    Plaintiff,       :          CIVIL ACTION NO. 18-1469
                                         :
        v.                             :
                                         :
LEHIGH UNIVERSITY,             :
                                         :
                    Defendant.     :

## MEMORANDUM OPINION

Smith, J.                                                         December 27, 2019

       In this matter, a former university employee alleges that the university violated Title VII of the Civil Rights Act of 1964 because she was a victim of a hostile work environment based on her race and gender, which ultimately resulted in her constructive discharge from the university. After a non-jury trial, the court finds that the plaintiff failed to prove by a preponderance of the evidence that the university violated Title VII because, *inter alia*, she did not show (1) any credible evidence that Lehigh or its employees intentionally discriminated against her because of her race or gender and (2) even if there was any discrimination, it was not severe or pervasive, and it would not have detrimentally affected a reasonable person in like circumstances. At bottom, the plaintiff failed to show that her working conditions at the university were so intolerable that a reasonable person in the plaintiff's position would have felt compelled to resign. Accordingly, the court will enter judgment in favor of the university and against the plaintiff.

## I.       PROCEDURAL HISTORY

       The plaintiff, Angela Scott Ferencin, commenced this action by filing a complaint against the defendant, Lehigh University ("Lehigh"), on April 9, 2018. Doc. No. 1. In the complaint, the plaintiff alleges that she is an African-American female whom Lehigh, "a private institution of

higher education," first employed on May 31, 2012, as the Director of Academic Diversity and Outreach. Compl. at ¶¶ 4–6, Doc. No. 1. The plaintiff remained at Lehigh until her constructive discharge on June 30, 2017. *Id.* at ¶ 5. At the time of the constructive discharge, the plaintiff "had been reduced in rank to Program Director, Community Education Initiative." *Id.* at ¶ 6.

The plaintiff alleges that during her approximately five years of employment with Lehigh, she encountered "working conditions so intolerable that she felt compelled to resign." *Id.* at ¶ 8. Those working conditions included, *inter alia*: (1) Dr. Henry Odi, Lehigh's Vice Provost for Diversity and Inclusion, yelling at her and telling her that "'You are NEVER to disagree with me in public . . . by email or in person. You do not know your place! . . . You do not know your place. . . . to [sic] be successful here at Lehigh, you cannot disagree with leadership[;]" (2) Dr. Odi, without consulting the plaintiff, undertaking to defund a Lehigh program for which more than $80,000 had been raised by advising current donors to cease their contributions; (3) a "younger, white woman who [the plaintiff] had hired two years earlier" accused the plaintiff of retaliating against her;[1] (4) despite the investigation of retaliation resolving in the plaintiff's favor, Lehigh placed her under a new supervisor, who had only two years of relevant experience; (5) despite the plaintiff having 25 years' experience in higher education, Lehigh's Vice President of Human Resources told her that the failure to comply with her new supervisor's request could be seen as insubordination; and (6) the plaintiff's new position required her to work in a small cubicle. *Id.* at ¶¶ 8–12. The plaintiff asserts that during her employment with Lehigh "there were not any [other] instances of [Lehigh] subjecting white men, white women, or African American men to the hostile conditions to which she was subjected at Lehigh." *Id.* at ¶ 14.

---

[1] A formal investigation into the allegations of retaliation determined that there was insufficient credible evidence to conclude that the plaintiff had retaliated against this other employee. Compl. at ¶¶ 9, 10.

The plaintiff asserts a cause of action under Title VII, 42 U.S.C. § 2000e-2(a)(1).[2] *Id.* at ¶ 1. She seeks monetary damages, attorney's fees and costs, and any other relief that the court would deem proper. *Id.* at p. 4.

Lehigh filed an answer and affirmative defenses to the complaint on June 27, 2018. Doc. No. 5. This matter later proceeded through a non-jury trial before the undersigned from July 8, 2019, through July 11, 2019. Thereafter, the parties submitted proposed findings of fact and conclusions of law. Doc. Nos. 25, 42, 43, 46. This matter is now ripe for disposition.[3]

## II.   FINDINGS OF FACT

After carefully considering the evidence presented during the non-jury trial in this matter from July 8, 2019, to July 11, 2019, and, after assigning such weight to the evidence as the court deems proper and disregarding the testimony that the court found to lack credibility, the pertinent facts are as follows:

### A.   Lehigh's Hiring of the Plaintiff as Director of Academic Diversity and Outreach

1.   After completing her doctoral degree coursework at Rowan University in May 2012, the plaintiff wanted to return to a higher education administration position.[4] 7-8-19 Tr. I at

---

[2] The complaint also referenced the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(2) ("ADEA"). The plaintiff's counsel indicated during the initial pretrial conference that the plaintiff was not pursuing an ADEA claim. Despite this representation, the plaintiff once again mentioned the ADEA in her proposed findings of fact and conclusions of law submitted after the non-jury trial in this matter. *See* Pl.'s Proposed Findings of Fact and Conclusions of Law ("Pl.'s Findings and Conclusions") at ECF p. 9, Doc. No. 46.

[3] The court notes that the plaintiff stipulated to the authenticity and admissibility of Lehigh's exhibits. Tr. of Specific Witness Testimony, July 8, 2019 ("7-8-19 Tr. I") at 4–9, Doc. No. 33. Unfortunately, due to the way the plaintiff presented her exhibits, Lehigh did not stipulate to the authenticity and admissibility of these exhibits and instead objected to each document. *See, e.g.*, Tr. of Excerpt of Trial July 11, 2019 ("7-11-19 Tr. II") at 7, Doc. No. 40. Lehigh noted that it was unable to corroborate that the documents in the plaintiff's exhibit binder were documents provided during discovery because they lacked the bates stamps Lehigh had graciously applied to them when turned over by the plaintiff's counsel. Additionally, multiple documents (or portions of those documents) included in the exhibit binder are barely legible. *See, e.g.*, Pl.'s Ex. 12.

   Most of the plaintiff's exhibits are duplicates of exhibits included in Lehigh's exhibit binder. *See, e.g.*, Pl.'s Exs. 3–11, 13, 18. Some of the exhibits are the plaintiff's notes, but those were not referenced during her testimony (except to the extent her testimony overlapped with what she included in her notes). *See* Pl.'s Exs. 19–22. In addition, the plaintiff's counsel indicated that he was not asking for the notes to be admitted. *See* 7-11-19 Tr. II at 6.

[4] Regarding her education and professional background, the plaintiff obtained a Bachelor of Arts in Women's and Gender Studies from Rutgers University in 1992. Def.'s Ex. 3. She went on to obtain a Master of Science in Higher

9–10; Def.'s Ex. 3. As part of this endeavor, she applied for the position of Director of Academic Diversity and Outreach at Lehigh. 7-8-19 Tr. I at 9–10.

2.      The plaintiff is an African-American woman. 7-8-19 Tr. I at 95.

3.      Lehigh created the Director of Academic Diversity and Outreach position after Dr. Henry Odi was promoted to Vice Provost for Academic Diversity in 2011. June 21, 2019 Videotaped Dep. of Henri Odi, Ed.D. ("Odi Dep.") at 19.[5] After Dr. Odi's promotion, he requested that Provost Patrick Farrell create the Director of Academic Diversity and Outreach position to continue the programs Dr. Odi previously administered while Dr. Odi focused on the "University-wide effort that [he] was hired to do." Odi Dep. at 19–20.

4.      At the time of Dr. Odi's promotion, he had been employed at Lehigh for approximately 25 years.[6] Odi Dep. at 7.

5.      Dr. Odi is an African-American male who became a citizen of the United States after emigrating from Nigeria.[7] 7-8-19 Tr. I at 95; Odi Dep. at 10.

6.      Dr. Odi's work experience has included affirmative action work for Lehigh, outreach work, and undergraduate and graduate student recruitment to help Lehigh diversify its work force and student body. Odi Dep. at 12.

---

Education Management from the University of Pennsylvania in 1995. *Id.*; 7-8-19 Tr. I at 36–37. From 1995 until 2012, the plaintiff worked in various capacities at the University of Pennsylvania, Haverford College, Temple University, Rowan University, Philadelphia University, and the Perkins Center for the Arts. Def.'s Ex. 3. While obtaining her master's degree, the plaintiff also worked as a secretary at Princeton University. 7-8-19 Tr. I at 37.

         The court notes that the plaintiff testified that she also worked at Morehouse School of Medicine, but this experience does not appear to have been included in her curriculum vitae attached to her application for the Director of Academic Diversity and Outreach position. *See id.*; Def.'s Ex. 3.

[5] The court viewed the videotaped deposition via the video submitted by the parties but references the transcript of this deposition in this opinion simply for ease of reference.

[6] Dr. Odi had multiple positions at Lehigh during his tenure there. Odi Dep. at 7–8.

[7] For reasons unknown, the plaintiff declined to identify Dr. Odi as an African-American male; instead, she asserted that he is an "African male." 7-8-19 Tr. I at 95.

7. Dr. Odi's position at Lehigh involved increasing participation and success of under-represented minorities at Lehigh. 7-8-19 Tr. I at 100.

8. As with Dr. Odi, the Director of Academic Diversity and Outreach fell under Provost Farrell's "stem" at Lehigh.[8] 7-8-19 Tr. I at 13. Dr. Odi reported directly to Provost Farrell.[9] Odi Dep. at 9; 7-10-19 Tr. I at 4.

9. Dr. Odi assembled a search committee, comprised of Lehigh staff and faculty, for reviewing applicants for the Director of Academic Diversity and Outreach position. Odi Dep. at 98; 7-8-19 Tr. I at 11.

10. Jacob Napoleon ("Leon") Washington ("Mr. Washington") was the head of Lehigh's search committee.[10] 7-8-19 Tr. I at 11, 12; 7-10-19 Tr. I at 58.

11. Dr. Odi participated in reviewing each candidate who came to campus for an interview. Odi Dep. at 98.

12. Approximately two months after applying for the Director of Academic Diversity and Outreach position, the plaintiff participated in a phone interview with Lehigh's search committee. 7-8-19 Tr. I at 11. She then came to Lehigh's campus for a two-day, on-campus interview in late March 2012. *Id.*

13. Mr. Washington noted that during the interview process, the plaintiff impressed the search committee because she was very smart and represented herself well. 7-10-19 Tr. I at 59. In

---

[8] The plaintiff described this "stem" as those positions at Lehigh within "the provost's division." 7-8-19 Tr. I at 13. It covers the positions and offices existing in a line of reporting that fall under the Provost's authority and direction. *Id.*
[9] Provost Farrell was responsible for the stems relating to all the academic programs, the library, IT, admissions, research, and international affairs. Tr. of Specific Witness Testimony, July 10, 2019 ("7-10-19 Tr. I") at 4, Doc. No. 35.
[10] Mr. Washington worked at Lehigh from June 2007 until August 31, 2016, and he had previously served as Lehigh's Dean of Admission and Financial Aid and, after a promotion, the Vice Provost of Admission and Financial Aid. 7-10-19 Tr. I at 57–58. He is currently the Dean of Enrollment Management at Villanova University. 7-10-19 Tr. I at 58.

addition, she had finished all the coursework for her doctoral degree and was starting the research for her dissertation. *Id.*

14. During the two-day, on-campus interview, the plaintiff met with Dr. Odi at his office at 618 Broadhead Avenue in Bethlehem. 7-8-19 Tr. I at 12. The plaintiff and Dr. Odi went on a vehicle tour of Bethlehem in which Dr. Odi "shared highlights of the city with [her] and drove through apartment complexes to show [her] housing options." *Id.*

15. On a later date, Dr. Odi offered the position of Director of Academic Diversity and Outreach to the plaintiff and she accepted the offer.[11] 7-8-19 Tr. I at 13. Dr. Odi was instrumental in hiring the plaintiff. *Id.* at 95–96.

16. A Lehigh human resources representative sent an offer letter to the plaintiff and with the letter was a position description for the Director of Academic Diversity and Outreach. 7-8-19 Tr. I at 14. This position description matched what the plaintiff expected when she applied for the job. *Id.*

17. After the plaintiff accepted the offer to work at Lehigh, Dr. Odi sent her a confirmation letter in which he, *inter alia*, indicated that he was "looking forward to working with you, as are others across campus, to leverage our collective work to promote and advance diversity, inclusion, engagement and outreach." Def.'s Ex. 4; 7-8-19 Tr. I at 105–06.

18. The plaintiff was excited to embark on her role with Lehigh because (1) she had been in higher education for approximately 25 years and was committed to working with students and supporting a college or university, and (2) the position would allow her to work with college students as well as local middle and high school students, including students from underrepresented and low income areas. 7-8-19 Tr. I at 15.

---

[11] At the time, the plaintiff was not married to her current spouse and referred to herself as Angela Scott. Odi Dep. at 9.

19.     The plaintiff's new position provided multiple opportunities that interested her, including, *inter alia*: (1) the S.T.A.R. (Students That Are Ready) Academy, which had a STEM (Science, Technology, Engineering, and Math) focus and allowed students to come to Lehigh's campus and explore opportunities there; (2) the High School Scholars Program, which provided opportunities for high school students to take courses at Lehigh and earn college credits; (3) the "LEAPS" program, which involves students from the Milton Hershey School;[12] and (4) oversight of the annual Lehigh Valley Science and Engineering Fair (the "Fair") in which local students come to Lehigh to showcase their science projects for Lehigh faculty, local teachers, and engineers. 7-8-19 Tr. I at 15–18; *see also* Odi Dep. at 13–14 (explaining that plaintiff worked primarily with three or four programs, including S.T.A.R. Academy, High School Scholars Program, and the Fair; later, plaintiff was involved with LEAPS).

## B.     The Plaintiff's Experiences with Dr. Odi

20.     Dr. Odi was the plaintiff's direct supervisor while she served as the Director of Academic Diversity and Outreach. 7-8-19 Tr. I at 19.

21.     The plaintiff indicated that she had minimal interaction with Dr. Odi. 7-8-19 Tr. I at 18. Other than one biweekly one-on-one meeting, she stated that they did not regularly communicate. 7-8-19 Tr. I at 18.

22.     The plaintiff indicated that Dr. Odi's office door was always closed. 7-8-19 Tr. I at 39.

23.     The plaintiff's office was located no more than two feet away from the door to Dr. Odi's office. Tr. of Specific Witness Testimony, July 9, 2019 ("7-9-19 Tr. I") at 14, Doc. No. 34.

---

[12] Dr. Odi testified that the program involved recruiting students from the Milton Hershey School, and it was started to help low income, mostly minority students, attend Lehigh. Odi Dep. at 49–50.

24.     The plaintiff attempted to be collegial with Dr. Odi by knocking on his door, opening the door, and saying good morning each morning, and by knocking on the door, opening the door, and saying good night at the end of the day. 7-8-19 Tr. I at 39.

25.     Although the plaintiff asked Dr. Odi if they could have weekly one-on-one meetings, Dr. Odi agreed to only having biweekly meetings. 7-8-19 Tr. I at 18–19.

26.     Dr. Odi occasionally missed the biweekly meeting.[13] 7-8-19 Tr. I at 19, 41.

27.     For the biweekly meetings, the plaintiff would provide Dr. Odi with an agenda for the meetings, and she gave him the opportunity to obtain updates on everything she was doing, including work with the S.T.A.R. Academy. 7-8-19 Tr. I at 19.

28.     The plaintiff was dissatisfied with the limited interaction with Dr. Odi. 7-8-19 Tr. I at 39, 40. She explained that they "just did not talk and that was challenging to me to be reporting to someone who [she] thought wanted [her] there and his actions showed otherwise." 7-8-19 Tr. I at 40.

29.     Concerning the S.T.A.R. Academy, Dr. Odi's wife, Patricia Odi, designed and founded the S.T.A.R. Academy in 1988–89 when she was working as the Assistant Director of Admissions at Lehigh. Odi Dep. at 15–17.

30.     The S.T.A.R. Academy is a specifically designed, originally year-long program to assist and educate students of color with the process of applying to college, obtaining financial aid for college, and other aspects of gaining admittance and achieving success in college. Odi Dep. at 16, 36; 7-8-19 Tr. I at 105. It is a one-on-one program with up to 100 underserved and unrepresented minority middle and high school students matching up with undergraduate and

---

[13] Although somewhat unclear, the plaintiff asserts that Dr. Odi occasionally did not notify her if he was going to miss the meeting. 7-8-19 Tr. I at 19, 41.

graduate students at Lehigh and 15 to 25 Lehigh professors. Odi Dep. at 36. They had as many as 12 of the middle or high school students go to college in a given year. *Id.* at 38–39.

31.     Bill Beattie, a Lehigh alumnus, funded the S.T.A.R. Academy, and he and Dr. Odi had a "very strong relationship." Odi Dep. at 28–29. Mr. Beattie provided a significant financial donation to Lehigh to fund the S.T.A.R. Academy long-term. *Id.* at 29–30.

32.     Although Mrs. Odi ceased working at Lehigh in 1992, she continued to work with the S.T.A.R. Academy. Odi Dep. at 18–19. She did so on a volunteer basis.[14] *Id.* at 19.

33.     Dr Odi was previously personally involved in oversight and day-to-day operations of the S.T.A.R. Academy. 7-8-19 Tr. I at 19, 59; Def.'s Ex. 5. He continued to be involved in oversight of the S.T.A.R. Academy after the plaintiff started at Lehigh, and he did not pass off oversight of it to the plaintiff after she started. 7-8-19 Tr. I at 19–20.

34.     The plaintiff, with the assistance of a colleague, Debra Rubart, identified multiple concerns with the S.T.A.R. Academy. 7-8-19 Tr. I at 20–23. Those concerns included what the plaintiff believed were risk management issues, the possible misappropriation of funds, and the possible inappropriate promotion of a religious theme at a secular university. 7-8-19 Tr. I at 20–21. In addition, the plaintiff believed that Dr. Odi should have passed off responsibility for the program to the plaintiff because it was part of her job description. *Id.* at 19–20, 25.

35.     The plaintiff did not believe that Dr. Odi had the right to decline to pass along all responsibilities for the S.T.A.R. Academy to her during her first year of employment, even though he was her supervisor, because responsibility for the S.T.A.R. Academy was in her job description. 7-9-19 Tr. I at 6–7; *see* 7-8-19 Tr. I at 25 ("And what inevitably happened in . . . that year was that

---

[14] Dr. Odi asserts that his wife worked with the S.T.A.R. Academy on a volunteer basis, *see* Odi Dep. at 18–19. The plaintiff asserts that Mrs. Odi received a stipend for this work. *See* Pl.'s Findings and Conclusions at ¶ 14. Ultimately, it is irrelevant to any issue in this lawsuit whether Mrs. Odi was paid for her work with the S.T.A.R. Academy.

the S.T.A.R. Academy and the oversights [sic] and the implementation of the program was officially passed off to me. It was on my job description from day one."); Def.'s Ex. 6, Apr. 24, 2013 Mem. from Pl. to Dr. Odi ("Since May 31, 2012, I have had the responsibilities in my job description of 'oversee[ing] the management and expansion of the well-established existing academic outreach programs, i.e. the S.T.A.R. Academies – summer and academic year programs' and 'manag[ing] budgets' in the Office of Academic Outreach."); 7-8-19 Tr. I at 58–59 (plaintiff indicating that she should have been responsible for design and implementation of S.T.A.R. Academy but was not during her first year at Lehigh because Dr. Odi and his wife ran academy from their home).

36.     The plaintiff and Ms. Rubart met with Dr. Odi to discuss these concerns, and Dr. Odi told them that he would "take care of things."[15] 7-8-19 Tr. I at 23.

37.     The plaintiff believed that Dr. Odi was not addressing the concerns she identified, so she and Ms. Rubart met with Frank Roth, the general counsel at Lehigh, to share with him what they found. 7-8-19 Tr. I at 23–24. The plaintiff also discussed her concerns with the former director of risk management for Lehigh, and Patricia Mann ("Ms. Mann"), the Director of Administration in the Provost Office. 7-8-19 Tr. I at 24; Tr. of Excerpt of Trial, July 9, 2019 ("7-9-19 Tr. II") at 6, Doc. No. 38.

38.     The plaintiff's complaints about Dr. Odi and Mrs. Odi's roles with the S.T.A.R. Academy, including Dr. Odi not turning over oversight of the program to the plaintiff upon her arrival at Lehigh, did not mention race or gender discrimination.

_____

[15] Dr. Odi testified that the plaintiff's concerns involved her wanting to take full control over the S.T.A.R. Academy and to not have Mrs. Odi involved in it. Odi Dep. at 26–27. Dr. Odi indicated that he went to Provost Farrell to discuss this issue and Provost Farrell told him to let the plaintiff run the academy. *Id.* at 27.

39.     Dr. Odi did not decline to turn over oversight and responsibility of the S.T.A.R. Academy to the plaintiff because he was discriminating against her based on her race or gender or because he had any discriminatory animus toward her.[16]

40.     Dr. Odi continuing to operate the S.T.A.R. Academy after the plaintiff began her employment at Lehigh, including allowing his wife to continue to be involved with the program, until ultimately transferring oversight of the program to the plaintiff, did not create a hostile work environment on the basis of race or gender, either alone or in combination with other interactions that Dr. Odi had with the plaintiff in the workplace.

41.      In April 2013, after the plaintiff had been in her position for approximately one year, Dr. Odi passed off the S.T.A.R. Academy for her to oversee and implement.[17] 7-8-19 Tr. I at 19, 25, 26; Def.'s Ex. 5; Odi Dep. at 27–28.

42.     The plaintiff responded to Dr. Odi's April 12, 2013 letter by sending him a memorandum dated April 24, 2013. Odi Dep. at 32; Def.'s Ex. 6. In the memorandum, the plaintiff, *inter alia*, asked for autonomy over the S.T.A.R. Academy budget and the sole responsibility for maintaining relationships with donors. Def.'s Ex. 6.

43.     Dr. Odi did not believe that it was a good practice to transition work with donors to the plaintiff because he had created and fostered those relationships over many years and the donors were still comfortable dealing with him. Odi Dep. at 33.

---

[16] While there was no direct testimony on this issue, it appears that Dr. Odi did not turn over responsibility of the S.T.A.R. Academy to the plaintiff because he and his wife founded the program. Even if the court credited the plaintiff's testimony on this issue, Dr. Odi would have kept control over the S.T.A.R. Academy to himself because his wife was receiving a stipend and he was misappropriating funds. Either way, there is no evidence that he did not transfer responsibility of the S.T.A.R. Academy to the plaintiff because of her race or gender.

[17] The plaintiff claims that Dr. Odi transferred responsibility of the S.T.A.R. Academy to her after Lehigh conducted an audit of the program. 7-8-19 Tr. I at 24–25. The plaintiff did not introduce evidence to corroborate her claim about the audit and, ultimately, Dr. Odi's reason for transferring responsibility is relevant only to the extent that it did not involve race or gender discrimination.

44.     The plaintiff asserts that Dr. Odi rarely asked her about the S.T.A.R. Academy after passing oversight of it to her. 7-8-19 Tr. I at 19.

45.     On October 1, 2012, Dr. Odi confronted the plaintiff in their office over what he deemed were prior actions by her that contradicted him in a public setting. 7-8-19 Tr. I at 42–44; Odi Dep. at 20–24. Dr. Odi requested that the plaintiff not challenge him in public and, if she disagreed with something he said, she should speak to him privately about it.[18] 7-8-19 Tr. I at 43; Odi Dep. at 23–24.

46.     The plaintiff believes that in the workplace of higher education, a supervisor should not tell a supervisee not to disagree with them in public because individuals in higher education often have disagreements. 7-8-19 Tr. I at 107.

---

[18] Unsurprisingly, the plaintiff and Dr. Odi provided conflicting accounts about what prompted Dr. Odi to speak to the plaintiff and what happened during the conversation. According to the plaintiff, on the preceding Friday, she had indicated to Robert Haines ("Mr. Haines"), a Lehigh graduate and 20-year (and exclusive) donor to the Fair, that there should be a breakfast for local guidance counselors for the Fair. 7-8-19 Tr. I at 44. Dr. Odi responded to this e-mail and indicated his disagreement with this proposal. *Id.* The plaintiff then responded to Dr. Odi's e-mail, although it is unclear what she said. *Id.*

Dr. Odi agrees that he and the plaintiff were having a conversation with Mr. Haines pertaining to the Fair, but he testified that this was an in-person conversation. Odi Dep. at 20–23. During this conversation, the plaintiff challenged something Dr. Odi stated, which caused Dr. Odi to end the conversation. Odi. Dep. at 20–23.

Regarding what transpired thereafter, the plaintiff testified that on October 1, 2012, Dr. Odi "beckoned" her to come upstairs to the second floor of the office so he could talk to her. 7-8-19 Tr. I at 42–43, 44. Dr. Odi then indicated that he was troubled by an e-mail the plaintiff sent to Mr. Haines. *Id.* at 43. The plaintiff indicated that Dr. Odi had his finger pointed at her and said to her that she was never to disagree with him in public and that, unlike other individuals at Lehigh (such as the President of the University and Provost Farrell), she did not know her place. *Id.* at 43, 107. The plaintiff asserts that this was the first time that anyone had ever yelled at her in the work place. *Id.* at 43. The plaintiff characterized Dr. Odi yelling at her as "a dramatic representation of the attitudes -- attitude and attitudes that Dr. Odi had and others had towards me at Lehigh University." *Id.* at 45. After this conversation, the plaintiff retrieved her belongings from her office and left the building "because [she] was fearful that [Dr. Odi] would continue with this behavior." *Id.* at 44.

Dr. Odi testified that when he and the plaintiff were back at the office, he asked to speak to the plaintiff. Odi Dep. at 23. Dr. Odi informed the plaintiff that it was inappropriate for her to challenge him when he is meeting with someone, and that if she disagreed with him that she should come to him privately. *Id.* Dr. Odi claims that Mr. Haines contacted him after the conversation with the plaintiff and said, "What's up with that?" *Id.* at 24. Dr. Odi denies yelling or screaming at the plaintiff and indicated that "[s]creaming is not part of my fabric." *Id.*

As reflected in this finding of fact, the court does not find the plaintiff's testimony that Dr. Odi "yelled" at her or pointed his finger in her face to be credible. Instead, the court has credited Dr. Odi's testimony on this issue, Odi Dep. at 24–25, 94, as it is more consistent with the other evidence in the record about Dr. Odi's demeanor. The court references this supporting evidence later in this opinion.

47.     The plaintiff does not believe that Dr. Odi had the right to determine the tasks she should or should not do. 7-8-19 Tr. I at 109. She believes that an employee's job description determines the employee's tasks and responsibilities. *Id.* at 109–10.

48.     Although doing so was often not part of her job description, the plaintiff would work with "community partners" on a regular basis. 7-8-19 Tr. I at 27. She did so to ensure "that the programs and the initiatives and the funds that were so very important to doing great work that they were stewarded well." *Id.* The plaintiff believes that she "made great relationships and partners with folks both near and far." *Id.*

49.     No community partner told the plaintiff that she rubbed them the wrong way. 7-8-19 Tr. I at 27.

50.     Dr. Odi never conducted a performance review for the plaintiff, and she "did not feel comfortable" with the fact that she never received any performance evaluations at Lehigh. 7-8-19 Tr. I at 41. She asked Dr. Odi for a performance review, but he did not give her one. *Id.*

51.     The plaintiff sought a performance review from Dr. Odi in part because she did not regularly communicate with him and thought that it would be an opportunity for her to "develop goals for [her]self, develop feedback, collaborate with him and really make things happen." 7-8-19 Tr. I at 41.

52.     Dr. Odi never completed a performance evaluation for the plaintiff even though he had been trained to do so. 7-8-19 Tr. I at 41–42; Odi Dep. at 53.

53.     Dr. Odi acknowledged that it was unfortunate that he did not conduct yearly performance reviews of the plaintiff because it was part of the best practices at Lehigh. Odi Dep. at 53, 101–02. He takes full responsibility for failing to do that and regrets not doing so. *Id.* He has

conducted written performance reviews with other individuals who have worked for him. *Id.* at 53–54.

54. Dr. Odi did not fail to complete any performance review for the plaintiff because he was discriminating against her based upon her race or gender. It is unclear why he failed to conduct a performance review, and it is possible that doing so would have improved his working relationship with the plaintiff.

55. During her time at Lehigh, the plaintiff never received a cut in her salary; instead, each year she received an "annual merit increase" which ranged between 2.5% and 3.5% of her salary. 7-8-19 Tr. I at 28. Dr. Odi recommended that the plaintiff receive annual increases in her salary. Odi Dep. at 54.

56. The plaintiff complained about her issues with Dr. Odi to Provost Farrell. 7-9-19 Tr. I at 9.

57. In June 2013, Dr. Odi had a meeting with Provost Farrell and the plaintiff to discuss the issues in their working relationship. Odi Dep. at 40. According to Dr. Odi, this "was probably one of the worst meetings that I've been a part of in my time at Lehigh" because the plaintiff blamed him for everything. *Id.* at 40–41.

58. Human Resources recommended that the plaintiff and Dr. Odi work through their issues via a third-party mediator.[19] 7-8-19 Tr. I at 55; 7-9-19 Tr. I at 14.

59. The plaintiff met with the mediator for a 90-minute session. 7-8-19 Tr. I at 55–56.

---

[19] The plaintiff indicated that Provost Farrell recommended mediation, but he denied recommending it. 7-10-19 Tr. I at 10. Instead, Provost Farrell looked at it as one of the possible options. *Id.* He viewed the issues between Dr. Odi and the plaintiff as "differences in perspective on how people should interact with [each] other in a workplace, [and] how to behave . . . professionally in a workplace." *Id.* at 11. He also saw it as a disagreement in work style. *Id.*

60.    Dr. Odi refused to participate in the mediation.[20] 7-8-19 Tr. I at 57–58; 7-9-19 Tr. I at 15; Odi Dep. at 41–42, 45.

61.    The plaintiff never heard anything else from Dr. Odi or Lehigh about mediation. 7-8-19 Tr. I at 58.

62.    Although the plaintiff speculates to the contrary, there is no credible evidence that Dr. Odi refused to participate in mediation because of her race and/or gender. 7-9-19 Tr. I at 15. Instead, Dr. Odi did not want to participate in any further discussions where he felt like the plaintiff was blaming him for every issue in their work relationship.

63.    The plaintiff is unaware of any mediations Dr. Odi participated in with anyone, including white men. 7-9-19 Tr. I at 15.

64.    In January 2014, Judy Zavalydriga ("Ms. Zavalydriga"), who is the Director of Employee Relations at Lehigh's Human Resources Office, reached out to the plaintiff to see how things were going with Dr. Odi. 7-9-19 Tr. I at 15; Tr. of Excerpt of Trial, July 10, 2019 ("7-10-19 Tr. II") at 42–43, Doc. No. 39; Tr. of Excerpt of Trial, July 8, 2019 ("7-8-19 Tr. II") at 21, Doc. No. 37; Def.'s Ex. 9. The plaintiff told Ms. Zavalydriga that she had no interest in discussing anything. 7-9-19 Tr. I at 15–16; 7-10-19 Tr. II at 43.

65.    Dr. Odi and the plaintiff continued to work together for almost three years after the discussions with Provost Farrell and the partial attempt at mediation. Odi Dep. at 50; 7-9-19 Tr. I at 16.

66.    In 2011, Lehigh started the Faculty and Staff of Color Network ("FSCN") after an African-American female, who was Lehigh's assistant director in multi-cultural affairs,

---

[20] The plaintiff testified that Dr. Odi told her that he was going to handle any issues "in house." 7-8-19 Tr. I at 58. Dr. Odi testified that he did not want to participate in mediation because he did not want to sit through anything with the plaintiff again in which she would blame him for everything. Odi Dep. at 41–42, 45.

approached Dr. Odi about a support group for staff of color at Lehigh. Odi Dep. at 56–57. The FSCN would provide networking and fellowship opportunities and reach out to Lehigh's undergraduate and graduate students. *Id.* at 57; 7-9-19 Tr. I at 21.

67.     Dr. Odi could not chair the FSCN, so he asked two African-American women, Lydia Benjamin and Jennifer Swan, to co-chair it. Odi Dep. at 57; 7-9-19 Tr. I at 22.

68.     The FSCN was "highly successful," and each year they would organize a welcome reception for all new faculty at Lehigh. Odi Dep. at 57.

69.     After the plaintiff started at Lehigh, she became Dr. Odi's liaison to the FSCN. Odi Dep. at 58; 7-9-19 Tr. I at 21–22.

70.     In 2014/early 2015, Dr. Odi received feedback from the FSCN co-chairs that the plaintiff was acting as a co-chair instead of as a liaison. Odi Dep. at 59; 7-9-19 Tr. I at 22. The co-chairs did not want the plaintiff to continue to act as a liaison.[21] 7-9-19 Tr. I at 22.

71.     Based on the co-chairs raising this issue, Dr. Odi met with the co-chairs and the plaintiff to discuss the responsibilities of co-chairs versus the liaison. Odi Dep. at 59–60, 61. Dr. Odi also drafted a document dated January 22, 2015, which provided a position description for the FSCN liaison. *Id.* at 60–61; 7-9-19 Tr. I at 22–23.

72.     After providing the plaintiff with the liaison position description, she informed Dr. Odi that she was not going to serve as the liaison anymore. Odi Dep. at 61.

73.     Umoja House is a residential building for students of color (specifically, African-American and Hispanic students) at Lehigh that Dr. Odi co-founded. Odi Dep. at 61–62; 7-9-19

_____

[21] The plaintiff testified that she did not have a conflict with the co-chairs which led to them requesting that she no longer act as liaison; instead, she indicated that they had wanted autonomy to run the network without oversight or collaboration with a staff member like the plaintiff. 7-9-19 Tr. I at 23–24. 68. The plaintiff did not feel that no longer serving as liaison for the FSCN had anything to do with her personally, it was simply because the group wanted autonomy and Dr. Odi trusted them to be good stewards of the budget and to implement his desires for the group. 7-10-19 Tr. I at 82.

Tr. I at 26, 27; *see also* 7-9-19 Tr. I at 26 (plaintiff agreeing that Umoja House was one of number of "themed residence halls where juniors and seniors can choose to live" and it "has a focus on fostering a sense of community through a shared exploration of diversity and multiculturalism"). It was created to help students of color foster a community and so the faculty can interact with these students at receptions or dinners. Odi Dep. at 62; 7-9-19 Tr. I at 26.

74.     When the plaintiff started working under Dr. Odi, he made her a staff adviser for Umoja House. Odi Dep. at 63; 7-9-19 Tr. I at 26.

75.     The plaintiff approached Dr. Odi because she learned that certain incidents occurred in the house, one of which resulted in the creation of a police report. Odi Dep. at 63–64. She wanted to see the police reports, but Dr. Odi expressed to her the need to discuss with Student Affairs about her ability to see the reports. *Id.* at 64.

76.     Dr. Odi and the plaintiff met with individuals, including Sharon Basso, the Dean of Students, to discuss the reports, but the meeting did not go well because the plaintiff blamed them for excluding her from access to the reports. Odi Dep. at 64.

77.     The plaintiff also had an issue pertaining to the Umoja House when the Dean of Students' Office chose a Griffin (Lehigh's version of a dorm's residential advisor) for Umoja House despite the plaintiff's opposition to that person being the right fit for the house. 7-9-19 Tr. I at 128, 129.

78.     In February 2016, the plaintiff informed Dr. Odi that she would no longer continue as an advisor for Umoja House. Odi Dep. at 63; Def.'s Ex. 11; 7-9-19 Tr. I at 27, 32–35.

79.     Dr. Odi sent the plaintiff a memorandum dated October 15, 2016, in which he laid out his expectations for her for the year. Odi Dep. at 78; Def.'s Ex. 27; 7-8-19 Tr. II at 25. Dr. Odi

sent the plaintiff this memorandum because he felt that the department was falling apart, and the one-on-one meetings were not very productive. Odi Dep. at 78, 108.

80.     Dr. Odi consulted with Chris Halladay ("Mr. Halladay"), the Associate Vice President of Human Resources for Lehigh, who was aware that Dr. Odi was attempting to clarify expectations with the plaintiff and he suggested that Dr. Odi memorialize the expectations in writing.[22] Odi Dep. at 78–79; 7-8-19 Tr. II at 25–26.

81.     Mr. Halladay did not assist Dr. Odi with drafting the memorandum, but he believed that Dr. Odi's document would hopefully "establish a much better flow of ability to supervise." 7-8-19 Tr. II at 25.

82.     Mr. Halladay believed that at least some of the conflict between the plaintiff and Dr. Odi related to not effectively communicating what the expectations were. 7-8-19 Tr. II at 65.

83.     At the time he sent the memorandum to the plaintiff, Dr. Odi believed that he would continue working with the plaintiff. Odi Dep. at 80.

84.     The plaintiff felt that Dr. Odi's memorandum was "a strategy that he was using for [her] detriment." 7-10-19 Tr. I at 41. She felt as such because she had begged him for performance evaluations for years and now, he wanted to put something in writing about his expectations. 7-10-19 Tr. I at 41.

85.     Despite the plaintiff's claims to the contrary, there is no evidence that Dr. Odi's memorandum was being used for her detriment. It is hypocritical for the plaintiff to complain of not receiving a performance review from Dr. Odi and then complain when he is finally attempting to set out his expectations for her in writing. There is no evidence that Dr. Odi was discriminating

---

[22] Mr. Halladay is essentially the chief human resources officer at Lehigh. 7-8-19 Tr. II at 20. Mr. Halladay first met the plaintiff while they served on the FSCN together. 7-8-19 Tr. II at 21–22. Although no testimony was provided on this, it appeared that Mr. Halladay is a Caucasian male.

against the plaintiff based on her race or gender when he created and sent her the memorandum. Instead, he was clearly attempting to bring stability to an unstable working relationship.

86.     Dr. Odi believed that he and the plaintiff had a civil, professional working relationship. Odi Dep. at 51. Dr. Odi admitted that he was mostly hands-off with his supervision, but he indicated that he would give some oral feedback to the plaintiff. Odi Dep. at 51–52, 53.

87.     Dr. Odi believed that the plaintiff was "okay" in running her programs. Odi Dep. at 52.

88.     The plaintiff claims that Dr. Odi discriminated against her because of her African-American race. 7-8-19 Tr. I at 96.

89.     In her deposition, when asked whether Dr. Odi ever made a statement that would show an animus against African-Americans, the plaintiff stated:

> So in October 2013 Henry Odi yelled at me at the top of his lungs and told me that -- and this was the actual quote -- "You do not stay in your place. Alice, who was the current president, knows her place. Patrick, who was the current provost, knows his place. You do not know your place."
>
> He then went on to share that I will not be successful at Lehigh University if I disagree with leadership. And he was referring to his leadership. And this was done in an office at the top of his lungs where others heard it.

Jan. 14, 2019 Dep. of Pl. ("Pl.'s Dep.") at 37–38; *see also* 7-8-19 Tr. I at 97–99.

90.     Although the court does not find the plaintiff's testimony about Dr. Odi yelling at her and what he said to her to be credible, even if the court did so, his statements and tone did not show any discriminatory animus towards the plaintiff based upon her race or gender. Instead, he was articulating, perhaps not in the most productive manner, his expectations for his supervisory relationship with the plaintiff. Dr. Odi's expectation that the plaintiff not disagree with him publicly is not unreasonable or unlawful, especially considering that the evidence in the record does not describe what the plaintiff said and the context in which the plaintiff said it.

91.     The plaintiff does not recall Dr. Odi stating anything disparaging African-Americans generally. 7-8-19 Tr. I at 100. The plaintiff also is not aware of any conduct by Dr. Odi, other than with respect to her, that discriminated against any African-Americans. *Id.*

92.     The plaintiff also claims that Dr. Odi discriminated against her on the basis of her gender. 7-8-19 Tr. I at 100–01.

93.     In her deposition, the plaintiff indicated that when Dr. Odi yelled at her about her need to know her place, he was discriminating against her for being a woman even though his statement about knowing her place referenced both the male provost and a female executive at Lehigh. 7-8-19 Tr. I at 101–02; Pl.'s Dep. at 43–44.

94.     Dr. Odi never discouraged anyone from continuing to donate to programs administered by the plaintiff. Odi Dep. at 86. Dr. Odi never disparaged the plaintiff to any donor. *Id.*

95.     Dr. Odi never insulted the plaintiff, yelled at her, or had any hostility toward her as an African-American woman. Odi Dep. at 94–95.

96.     Dr. Odi never encouraged one or more of the plaintiff's colleagues not to work with her. Odi Dep. at 102.

97.     The plaintiff believes that Dr. Odi was entirely at fault and she was not at fault for issues in their working relationship. 7-9-19 Tr. I at 13.

98.     Provost Farrell did not observe Dr. Odi discriminate against women or people of color; instead, he found Dr. Odi to be a "real strong advocate[] for students of color, faculty and staff of color." 7-10-19 Tr. I at 15–16.

99.     Provost Farrell did not observe Dr. Odi scream at anyone, and he believed that Dr. Odi was more of a conflict avoider. 7-10-19 Tr. I at 16.

100.     Provost Farrell occasionally interacted with the plaintiff on a variety of projects and he found her to be cooperative. 7-10-19 Tr. I at 7.

101.     On March 2, 2017, Lehigh's newly hired Vice President for Equity and Community, Dr. Donald Outing, stopped by to visit with Dr. Odi.[23] 7-9-19 Tr. I at 102. While there, he encountered the plaintiff and they had a discussion in her office about her job. *Id.* at 102–03. During this conversation, the plaintiff spoke to him about the issues and concerns that she had with Dr. Odi. *Id.* at 103. She indicated to Dr. Outing her suspicions as to how Dr. Odi managed money, and she did so in a manner that Dr. Outing could "only describe as embezzlement." *Id.* She also shared with Dr. Outing a letter from Dr. Odi to a donor in which he suggested that the donor's funds move from one program to another. *Id.*

102.     After learning more about the relationship between Dr. Odi and the plaintiff, Dr. Outing felt that it placed the plaintiff's conversation with him in a different context as Lehigh had already been aware of the problems between them and it appeared that she was expressing to him her dissatisfaction with the outcome of the resolution of certain issues. 7-9-19 Tr. I at 116.

103.     During the two years that he has been working with Dr. Odi at Lehigh, Dr. Outing has never observed Dr. Odi yell at anyone. 7-9-19 Tr. I at 113. He has never heard Dr. Odi make a disparaging remark about anyone. *Id.* Even though Dr. Odi discussed the difficult working relationship he had with the plaintiff (as Dr. Outing had to have a conversation with Dr. Odi about

---

[23] The plaintiff had been part of a group (the Council for Equitable Community ("CEC")) who had met with Dr. Outing during the hiring process which ultimately brought him to Lehigh. 7-9-19 Tr. I at 99. Dr. Outing started at Lehigh on February 1, 2017. *Id.* at 96. Dr. Outing has a Ph.D. in mathematics. *Id.* at 97; Def.'s Ex. 78. He spent 30 years in active military service. 7-9-19 Tr. I at 97; Def.'s Ex. 78. As part of his responsibilities at Lehigh, Dr. Outing is the senior advisor to Lehigh's president on all matters of equity and community and reports directly to the president. 7-9-19 Tr. I at 96, 101. He also oversees the strategic initiates to "ensure that Lehigh creates, promotes, and enhances a diverse and inclusive community there." *Id.* at 96. In Dr. Odi's new role at Lehigh, he reports directly to Dr. Outing. *Id.* at 101.

this so he could be confident about Dr. Odi's ability to supervise staff that they had in the office), he did not disparage her to Dr. Outing. 7-9-19 Tr. I at 113–14.

104. Dr. Odi did not discriminate against the plaintiff based upon her race or gender. Dr. Odi did not harbor any discriminatory animus against the plaintiff based on her race or gender.

105. Dr. Odi did not create a hostile work environment on the basis of race or gender, either in the October 2012 incident (even if the court were to credit the plaintiff's version of that event) or in combination of the other interactions that he had with the plaintiff in the workplace.

## C.    The Plaintiff's Experiences with Jill Forrest

106. In January 2014, Jill Forrest ("Ms. Forrest") transferred from Lehigh's Office of First Year Experience and began working as a Coordinator in the Academic Outreach office with the plaintiff and Dr. Odi.[24] 7-9-19 Tr. I at 18, 120, 121; *see also* Odi Dep. at 67. She is a Caucasian female who is younger than the plaintiff. 7-9-19 Tr. I at 36.

107. In her Coordinator role, Ms. Forrest reported to the plaintiff. Odi Dep. at 67; 7-9-19 Tr. I at 18.

108. The coordinator position is a non-exempt position, and Ms. Forrest desired to eventually acquire an exempt position at Lehigh. 7-9-19 Tr. I at 121–22.

109. Although Ms. Forrest wanted to be an exempt employee at Lehigh, she did not talk to Dr. Odi about getting the plaintiff's job and did not want the plaintiff's job. 7-9-19 Tr. I at 152–53.

110. The plaintiff delegated numerous tasks to Ms. Forrest. 7-9-19 Tr. I at 18. These tasks included certain work for the S.T.A.R. Academy. *Id.* at 19.

---

[24] Ms. Forrest has a Bachelor of Science degree in media communication technology from East Stroudsburg University. 7-9-19 Tr. I at 119.

111.     Ms. Forrest's responsibilities for the S.T.A.R. Academy included, *inter alia* (1) ordering t-shirts, linens, supplies, and catering services, (2) reserving the housing where the students would stay overnight, (3) arranging for transportation on and off campus, (4) coordinating with outside vendors to arrange for field trips, (5) publicizing counselor positions and sitting through interviews, (6) being present when students and participants arrived to hand out their keys and ensure they got to their rooms, and (7) shopping for groceries and submitting food orders. 7-9-19 Tr. I at 136–37.

112.     The plaintiff believed that Ms. Forrest was "good at fulfilling the responsibilities of the S.T.A.R. Academy program." 7-9-19 Tr. I at 20.

113.     Ms. Forrest testified that the plaintiff informed her that Lehigh would not fire the plaintiff because she was African-American. 7-9-19 Tr. I at 123.

114.     Ms. Forrest observed that Dr. Odi was "super friendly, very nice." 7-9-19 Tr. I at 124.

115.     Ms. Forrest did not see Dr. Odi treat the plaintiff any differently than he treated her. 7-9-19 Tr. I at 124. Dr. Odi did not "overly engage [with] anybody in the office." *Id.* at 125.

116.     Ms. Forrest never saw Dr. Odi yell at the plaintiff. 7-9-19 Tr. I at 124. She never saw him get angry. *Id.* at 124, 125. She never saw him disparage anyone. *Id.* at 125.

117.     Ms. Forrest observed that the plaintiff and Dr. Odi had a professional, but "minimal" relationship. 7-9-19 Tr. I at 125.

118.     From 2014 until the summer of 2016, the plaintiff and Ms. Forrest got along well. 7-9-19 Tr. I at 20, 122. Ms. Forrest even attended the plaintiff's wedding in 2016. *Id.* at 20.

119.     Ms. Forrest spent considerable time planning and implementing the S.T.A.R. Academy program for the summer of 2016. 7-9-19 Tr. I at 36–37.

120.     During the summer of 2016, the relationship between the plaintiff and Ms. Forrest deteriorated. 7-9-19 Tr. I at 20, 137, 138. According to Ms. Forrest, near the end of the S.T.A.R. Academy program that summer, the plaintiff made passive-aggressive statements about Ms. Forrest not being an exempt employee and her thinking she can come and go as she pleases. *Id.* at 137–38. Ms. Forrest was very surprised when she heard these statements because she previously had worked very well with the plaintiff. *Id.* at 138. The plaintiff did not directly explain to Ms. Forrest what she thought Ms. Forrest was doing wrong. *Id.*

121.     Although the plaintiff permitted Ms. Forrest to leave the office and join the program onsite, the plaintiff criticized her for spending too much time out of the office and for being too friendly with the student workers in the program. 7-9-19 Tr. I at 37.

122.     Ms. Forrest became more concerned because on the last day of the camp, the plaintiff told her to go back to the office and check her e-mail. 7-9-19 Tr. I at 139. When Ms. Forrest did so, there was an email for her to complete her self-assessment portion of her performance review. *Id.* Getting notice to complete this concerned Ms. Forrest because prior to this, the plaintiff, ironically, had not conducted performance reviews of Ms. Forrest. *Id.* at 139–40.

123.     Ms. Forrest was concerned because the plaintiff was now acting differently toward her and she had observed the plaintiff's "pattern of behavior" toward other individuals, namely, "once she's mad at you, there's no coming back. She cuts you off. You're dead to her." 7-9-19 Tr. I at 140.

124.     During the summer of 2016, Ms. Forrest and the plaintiff also had a conflict about Ms. Forrest's submission for mileage reimbursement after she was using her personal vehicle for transportation for the S.T.A.R. Academy. 7-9-19 Tr. I at 42, 149, 150; *see also* Def.'s Ex. 17. The

plaintiff declined to approve the request because Ms. Forrest had handwritten the mileage log and the plaintiff believed that she needed to include the information on a standard form that the controller's office used. 7-9-19 Tr. I at 42–43.

125.    Upon receiving word from the plaintiff that she would not approve the mileage, Ms. Forrest contacted Ms. Mann, who told her that the controller said that she did not need to complete the written form to be reimbursed. 7-9-19 Tr. I at 151.

126.    Ms. Forrest, despite telling the plaintiff that she had contacted the controller's office and was told that the handwritten log would suffice, completed the written form at the plaintiff's request; however, she submitted it a day late. 7-9-19 Tr. I at 43; *see also* Def.'s Ex. 19 (showing Ms. Forrest's attempts to get mileage approved after deadline). She did ultimately get reimbursed, but not until the following month. 7-9-19 Tr. I at 152.

127.    Because Ms. Forrest was concerned with maintaining her employment, she reached out to Ms. Mann and indicated that she was concerned that the plaintiff was "gunning for [her]." 7-9-19 Tr. I at 141.

128.    At the suggestion of Ms. Mann, Ms. Forrest reached out to Dr. Odi because he was the plaintiff's supervisor. 7-9-19 Tr. I at 141.

129.    In July 2016, Ms. Forrest sent Dr. Odi an e-mail and requested a meeting with him to discuss issues that she was having with the plaintiff. Odi Dep. at 67; 7-9-19 Tr. I at 141. They met at a location off campus and had a discussion. Odi Dep. at 67; 7-9-19 Tr. I at 141.

130.    The plaintiff was concerned about her interactions with Ms. Forrest during the summer program in 2016, so she tried to set up a meeting with Dr. Odi and Ms. Forrest to discuss and hopefully resolve these issues. 7-8-19 Tr. I at 63–64; Odi Dep. at 68; 7-9-19 Tr. I at 37.

131.    The plaintiff believed that her issues with Ms. Forrest were all due to the fault of Ms. Forrest and not due to any fault by the plaintiff. 7-9-19 Tr. I at 37.

132.    When the plaintiff talked to Dr. Odi about setting up this meeting, Dr. Odi told her that Ms. Forrest had already discussed with him complaints about the plaintiff. 7-8-19 Tr. I at 64; Odi Dep. at 68; 7-9-19 Tr. I at 37. The plaintiff had been away on vacation when Ms. Forrest spoke to Dr. Odi. 7-9-19 Tr. I at 39.

133.    When the plaintiff learned that Ms. Forrest had gone directly to Dr. Odi, she was unhappy because she believed that Ms. Forrest should have spoken to her instead of going to Dr. Odi. Odi Dep. at 68; 7-9-19 Tr. I at 37–38.

134.    Prior to having these issues with Ms. Forrest, the plaintiff believed that they had a wonderful working relationship. 7-8-19 Tr. I at 64.

135.    Dr. Odi agreed to sit in a meeting with the plaintiff and Ms. Forrest, but he indicated that he would not intervene or attempt to resolve their issues; instead, he would simply take notes from their conversation. 7-8-19 Tr. I at 64; Odi Dep. at 69–70; 7-9-19 Tr. I at 39.

136.    Dr. Odi, Ms. Forrest, and the plaintiff had a meeting where Ms. Forrest and the plaintiff voiced their concerns about each other. 7-8-19 Tr. I at 64; 7-9-19 Tr. I at 39, 143.

137.    Ms. Forrest asserts that the meeting was "a very volatile meeting" and the plaintiff yelled at her during the meeting.[25] 7-9-19 Tr. I at 143–44.

138.    During the meeting, Dr. Odi informed the plaintiff and Ms. Forrest that they needed to repair their working relationship. 7-9-19 Tr. I at 143, 144.

---

[25] Although the plaintiff referenced Ms. Forrest wanting to be an exempt employee and take the plaintiff's job if she were to leave, Ms. Forrest never mentioned this to Dr. Odi and he had not heard of this prior to the meeting. Odi Dep. at 72–73. Dr. Odi never told Ms. Forrest that she could have the plaintiff's job if the plaintiff left Lehigh. *Id.* at 73.

139.    Dr. Odi took notes from this meeting. Although apparently a document was prepared by the plaintiff showing that the purpose of the meeting was for performance feedback for Ms. Forrest, Dr. Odi indicated that it was not a performance-based meeting, and was not only about Ms. Forrest, but about her and the plaintiff.[26] Odi Dep. at 70–72; Def.'s Ex. 13.

140.    After the meeting, the plaintiff confronted Ms. Forrest about why she went directly to Dr. Odi about her concerns instead of first relaying them to the plaintiff. 7-9-19 Tr. I at 41–42.

141.    Apparently, the plaintiff had prepared to give Ms. Forrest a yearly performance review shortly after the meeting with the two of them and Dr. Odi, but Dr. Odi determined that this was not a good time to perform the appraisal in light of what had recently transpired between the plaintiff and Ms. Forrest. Odi Dep. at 73–74; Def.'s Exs. 14–16. Dr. Odi conferred with Human Resources about this plan, and they supported his decision.[27] Odi Dep. at 74.

142.    On or about August 26, 2016, the plaintiff asked Linda Lefever for approval to place Ms. Forrest on a performance improvement plan in part because of the late mileage reimbursement form.[28] 7-9-19 Tr. I at 43–44; 7-8-19 Tr. II at 21, 73, 75; Def.'s Ex. 20.

143.    After receiving this call from the plaintiff, Ms. Lefever sent an e-mail to Mr. Halladay and Ms. Zavalydriga to inform them of the call and her response to the plaintiff whereby she informed the plaintiff that placing Ms. Forrest on a performance improvement plan for her

---

[26] Despite this being a meeting whereby the plaintiff and Ms. Forrest would discuss their concerns with each other, the plaintiff drafted a memorandum titled "Performance Feedback for Jill Forrest." 7-9-19 Tr. I at 39–41; Def.'s Ex. 13. The plaintiff drafted this document despite acknowledging that the purpose of the meeting was not performance feedback. 7-9-19 Tr. I at 40–41. The plaintiff testified that she forwarded this document to Human Resources at its request. *Id.* at 39, 40.

[27] In July 2016, the plaintiff reached out to Linda Lefever ("Ms. Lefever"), a Human Resources Specialist, and explained to her that Dr. Odi wanted to delay any performance evaluation of Ms. Forrest. 7-8-19 Tr. II at 74–75; Def.'s Ex. 15; *see also* Def.'s Ex. 14. Ms. Lefever's understanding was that there was discord between Ms. Forrest and the plaintiff and Dr. Odi was trying to work that out. 7-8-19 Tr. II at 75. The plaintiff indicated to Ms. Lefever that Dr. Odi was attempting to move forward and "build a trusting positive work relationship/environment." *Id.*

[28] Ms. Lefever works under Ms. Zavalydriga. 7-8-19 Tr. II at 21, 73.

failure to submit mileage reimbursement would be inappropriate. 7-8-19 Tr. II at 75, 76; Def.'s Ex. 20.

144.     Later that day, Linda Lefever called the plaintiff to tell her that they would not be placing Ms. Forrest on a performance improvement plan because the plaintiff's grounds for doing so were insufficient. 7-9-19 Tr. I at 44, 76.

145.     The plaintiff's articulated grounds for placing Ms. Forrest on a performance improvement plan were insufficient.

146.     At the time that the plaintiff sought approval to place Ms. Forrest on a performance improvement plan, she was aware that Ms. Forrest had been complaining about the plaintiff to Ms. Mann, Ms. Zavalydriga, and Karen Salvemini, Esquire ("Attorney Salvemini"), Lehigh's Equal Opportunity Compliance Coordinator and Title IX Coordinator, 7-9-19 Tr. I at 44–46; Pl.'s Dep. at 115–16; 7-10-19 Tr. II at 35.

147.     Ms. Forrest reached out to Ms. Mann about making a complaint to the Equal Opportunity Compliance Office regarding her issues with the plaintiff. 7-9-19 Tr. II at 14–15. Although Ms. Mann gave Ms. Forrest advice about the process, any advice did not have to do with any hostility toward the plaintiff on the basis of her race or sex. *Id.* at 15. Ms. Mann has helped others with this process as well. *Id.* at 14–15.

148.     Ms. Forrest communicated with Attorney Salvemini, and she ultimately submitted a Title IX complaint of retaliation against the plaintiff in September 2016. 7-8-19 Tr. I at 33–34, 66; 7-9-19 Tr. I at 46, 154, 155; Def.'s Exs. 21, 24, 25; 7-10-19 Tr. II at 37–38.

149.     Attorney Salvemini "oversee[s] anything having to do with harassment, discrimination, retaliation and sexual misconduct" at Lehigh. 7-10-19 Tr. II at 36. She "handle[s]

the educational component of that and also the response piece to reports of those types of behaviors." *Id.*

150. Ms. Forrest indicated that she did not file a Title IX complaint because the plaintiff was not discriminating against her on the basis of sex; instead, she felt like the plaintiff was retaliating against her for reaching out to Dr. Odi out of concern over how the plaintiff was behaving toward her. 7-9-19 Tr. I at 154. In addition, Ms. Forrest indicated that the plaintiff was taking away her opportunities insofar as she was no longer working with the High School Scholars or the Fair. *Id.* at 155. In addition, the plaintiff had prevented Ms. Forrest from seeing her calendar so she would not know what to tell people about the plaintiff's availability when they would call for the plaintiff. *Id.*

151. After a thorough investigation, the Provost determined that the plaintiff did not retaliate against Ms. Forrest and Lehigh did not discipline her.[29] 7-8-19 Tr. I at 34–35; Def.'s Ex. 32; 7-9-19 Tr. I at 47, 156; 7-10-19 Tr. I at 8.

152. Ms. Forrest recognized that she had a right to appeal from the Provost's decision, but she declined to do so. 7-9-19 Tr. I at 156.

---

[29] Attorney Salvemini and Chris Mulvihill, Lehigh's then-Interim Associate Dean of Students, conducted the investigation into Ms. Forrest's retaliation complaint. Def.'s Ex. 32; 7-9-19 Tr. I at 46; 7-10-19 Tr. II at 38. They prepared a comprehensive summary of their investigation of the complaint and recommended that Provost Farrell find that the plaintiff did not retaliate against Ms. Forrest. Def.'s Ex. 32; 7-10-19 Tr. II at 38. Provost Farrell sent letters dated January 16, 2017 to the plaintiff and Ms. Forrest about the investigation and his decision. Def.'s Ex. 32. Provost Farrell's letter to the plaintiff stated, *inter alia*, as follows:

> Based on the investigators' report, I have determined that you have not engaged in retaliation or other inappropriate behavior toward Ms. Forrest. I do note some examples where communication between you and Ms. Forrest could have been better, but I agree with the investigators that, given the definition of retaliation, I do not see that your actions rose to that level.

*Id.*

153.    The plaintiff does not believe that the resolution of the Title IX complaint in her favor is indicative of a lack of discrimination by Lehigh; instead, she viewed it as a failed attempted to "get her," and believed that Lehigh was going to continue to try to "get her." 7-11-19 Tr. I at 9.

154.    Dr. Odi believed that Ms. Forrest was hard working and had done a very good job in her coordinator role. Odi Dep. at 73.

155.    Dr. Odi played no role in Ms. Forrest filing the Title IX complaint against the plaintiff. Odi Dep. at 76. She did tell him that she was intended to file one and he essentially told her that she had a right to proceed if she wanted to do so. *Id.* at 103–04.

156.    In November 2016, Dr. Odi sent the plaintiff a letter informing her that effective November 16, 2016, Ms. Forrest would be working in a new position as coordinator in the Provost's Office. Odi Dep. at 80; Def.'s Ex. 28. The letter also informed the plaintiff that, *inter alia* (1) Ms. Forrest would support the Fair and (2) the plaintiff would no longer oversee the Fair. Odi Dep. at 80–81; Def.'s Ex. 28; *see also* 7-8-19 Tr. I at 31; 7-9-19 Tr. I at 158.

157.    Mr. Haines had indicated that he preferred that Ms. Forrest continue to work with the Fair. Odi Dep. at 81; 7-9-19 Tr. I at 158–59. Mr. Haines was no longer comfortable working with the plaintiff.[30] Odi Dep. at 82; 7-9-19 Tr. I at 158–19.

158.    Lehigh did not transfer responsibility of the Fair from the plaintiff to Ms. Forrest because it was discriminating against the plaintiff based upon her race or gender.

159.    Ms. Forrest was not motivated in her actions against the plaintiff by hostility or discriminatory animus against the plaintiff based on the plaintiff's her race or gender. 7-9-19 Tr. I at 163–64.

---

[30] The plaintiff believes that she worked collaboratively with Mr. Haines in the oversight and implementation for the Fair. 7-10-19 Tr. I at 79.

160.    Neither Ms. Forrest's complaint to Dr. Odi about the plaintiff, Dr. Odi's involvement in meeting with the plaintiff and Ms. Forrest concerning their relationship and complaints about each other, nor Ms. Forrest's Title IX complaint and the investigation and findings thereto, created a hostile work environment on the basis of race or gender, either alone or in combination with other incidents in the workplace at Lehigh.

### D.    The Plaintiff Moves to the Center for Community Engagement

161.    Within a year of starting to work at Lehigh, the plaintiff began thinking of changing to another employment opportunity both inside and outside of Lehigh. 7-9-19 Tr. I at 6.

162.    The plaintiff had once applied for a position in the graduate office in Lehigh's business school, and she networked for other possible opportunities. 7-8-19 Tr. I at 30.

163.    The plaintiff eventually sought a transfer to a new position at Lehigh because she felt the time under Dr. Odi's supervision was "so challenging and negative that [she] needed to work in a different setting and [she] hoped that [she] could receive an opportunity to work with someone else who was more collaborative and had more of a positive experience for [her] on the campus." 7-8-19 Tr. I at 29–30.

164.    On August 22, 2016, while still reporting to Dr. Odi and while experiencing the issues with Ms. Forrest, the plaintiff reached out to Mr. Halladay to request to change her reporting arrangement to another stem at Lehigh. 7-8-19 Tr. I at 86; Def.'s Ex. 23; 7-8-19 Tr. II at 22–23. More specifically, the plaintiff sent Mr. Halladay a memorandum requesting a move to the Communications and Public Affairs stem and providing reasons why she would be a "valuable asset to the mission and vision of Communications and Public Affairs." Def.'s Ex. 23; 7-8-19 Tr. II at 24. The plaintiff attached a copy of her resume to the memorandum.[31] Def.'s Ex. 23.

---

[31] This version of the plaintiff's resume is somewhat confusing as it appears to show under her education that she has a Doctor of Education (EdD) in Educational Leadership from Rowan University. Def.'s Ex. 23. Yet, the plaintiff

165.     When the plaintiff's memorandum references "the negative climate currently existing within [her] work area," Mr. Halladay believed that, due to his prior discussions with the plaintiff, she was referring to her long-term issues with Dr. Odi and short-term issues with Ms. Forrest. 7-8-19 Tr. II at 23.

166.     After receiving this memorandum, Mr. Halladay spoke to the plaintiff and indicated to her that switching stems as she proposed "was a lot more complicated than just asking to have a different supervisor." 7-8-19 Tr. II at 24–25. It was "a complicated request that would . . . have to go through several channels of approval before anything ever moved on it." *Id.* at 25.

167.     Dr. Sarah Stanlick is the Director of the Center for Community Engagement ("CCE") and a faculty member in Sociology and Anthropology.[32] 7-10-19 Tr. II at 4.

168.     Dr. Stanlick has been a working professional in higher education since 2004, and she has been responsible for managing staffs during that time as well. 7-10-19 Tr. II at 5.

169.     Lehigh started the CCE in 2015 after it hired consultants who identified a need for specifically focusing on the academic learning and research aspects of community engagement. 7-10-19 Tr. II at 6. The CCE consults with Lehigh faculty interested in doing National Science Foundation grants with a community component to it, and it operates its own programs, such as for Lehigh summer fellows who are interested in civic engagement and research. *Id.*

---

acknowledged that she is still working toward this degree because her dissertation is incomplete. 7-8-19 Tr. I at 87–90. The plaintiff did not include a date next to this degree as she did with her other degrees, but there is nothing explicit about it (such as a reference that the plaintiff had completed all work except for her dissertation (designated as "ABD")) to show that she was still working toward the degree. The plaintiff used "ABD" on other versions of her resume, such as the resume she submitted when she applied for the position of Director for Academic Diversity and Outreach at Lehigh. 7-8-19 Tr. I at 90–91; Def.'s Ex. 3. The plaintiff indicated that she was not intending to deceive anyone by referring to an EdD on her resume without also indicating "ABD." 7-10-19 Tr. 1 at 39.

[32] Dr. Stanlick graduated from Lafayette College in 2004, and immediately began work at the Harvard Kennedy School's Carr Center for Human Rights Policy (non-nuclear proliferation). 7-10-19 Tr. II at 5. She has obtained numerous degrees, including an interdisciplinary Ph.D. in Learning Science and Technology. *Id.* at 4, 5; Def.'s Ex. 80. While not asked directly about this, it appears that Dr. Stanlick is a Caucasian female.

170. The plaintiff and Dr. Stanlick spoke on numerous occasions in 2016 about the plaintiff moving to the CCE to work under Dr. Stanlick. 7-9-19 Tr. I at 47–48; 7-10-19 Tr. II at 8–9; *see also* 7-9-19 Tr. I at 135–36 (Ms. Forrest describing plaintiff's statements that combining with Dr. Stanlick's group would potentially be beneficial).

171. Dr. Stanlick and the plaintiff knew each other professionally on campus, had worked together on various university committees, and the plaintiff had invited Dr. Stanlick to her wedding in 2016. 7-9-19 Tr. I at 48; 7-10-19 Tr. II at 7, 8. Dr. Stanlick also interacted with the plaintiff about the S.T.A.R. Academy, and she assisted on occasions when LEAPs students visited the campus. 7-10-19 Tr. II at 7–8.

172. The plaintiff liked Dr. Stanlick and respected her work on campus. 7-9-19 Tr. I at 49; Pl.'s Dep. at 125. Dr. Stanlick characterized their relationship at that time as "very positive" and "a really good relationship." 7-10-19 Tr. II at 8.

173. Dr. Stanlick believed that the plaintiff coming to the CCE was a good opportunity because (1) the plaintiff was performing a lot of work in her current role that was very conceptually valuable to the CCE and (2) the CCE could do more work with local school districts. 7-10-19 Tr. II at 9. Overall, Dr. Stanlick felt that "it was an opportunity to grow the center and to do more work that we appreciated and valued." *Id.*

174. Dr. Stanlick was aware that the plaintiff was unhappy in her role as the Director of Academic Diversity and Outreach. 7-10-19 Tr. II at 10.

175. In or around October 2016, Mr. Halladay helped work with the plaintiff and Dr. Stanlick about the plaintiff transferring to work under Dr. Stanlick. 7-8-19 Tr. II at 27.

176.    From Lehigh's perspective, much of the work to effect the plaintiff's transfer was trying to incorporate the plaintiff's projects into the CCE and Dr. Stanlick continuing to report directly to Provost Farrell. 7-8-19 Tr. II at 66.

177.    Mr. Halladay's impression of the situation was that the plaintiff was very open and excited about the possibility of working with Dr. Stanlick at the CCE. 7-8-19 Tr. II at 28; *see also* 7-8-19 Tr. II at 29–30; Defs.' Ex. 30. He also believed that Dr. Stanlick was looking forward to it as well. 7-8-19 Tr. II at 28. They had both communicated to him that they had a relationship over the past year or so and they felt like it was a good match. *Id.*

178.    Mr. Halladay thought there was "good potential" in the plaintiff moving to work with Dr. Stanlick. 7-8-19 Tr. II at 29.

179.    It was clear that the plaintiff would be reporting to Dr. Stanlick, and Mr. Halladay did not receive any inkling that the plaintiff looked disfavorably at that. 7-8-19 Tr. II at 66.

180.    Provost Farrell had to approve the plaintiff's move to the CCE. 7-8-19 Tr. II at 29.

181.    In November/December 2016, the plaintiff and Dr. Stanlick began the process of transferring the plaintiff from her position as the Director of Academic Diversity and Outreach to a position as a Project Director in the CCE under the supervision of Dr. Stanlick. 7-8-19 Tr. I at 29, 30; 7-9-19 Tr. I at 51; Odi Dep. at 82–83; 7-10-19 Tr. II at 11–12.

182.    The plaintiff and Dr. Stanlick jointly prepared the position description for the plaintiff's new position at the CCE. 7-9-19 Tr. I at 51; 7-10-19 Tr. II at 11; *see also* Defs.' Exs. 29, 30, 33, 35.

183.    The plaintiff's salary did not change after starting with the CCE. 7-9-19 Tr. I at 55.

184.    The plaintiff recognized that upon moving positions she would be reporting to Dr. Stanlick. 7-10-19 Tr. I at 48.

185.     The plaintiff claims that her transfer was involuntary, yet she was excited about the transfer at the time and had agreed to move to this new position. 7-8-19 Tr. I at 33; 7-9-19 Tr. I at 49.

186.     Provost Farrell believed that the plaintiff working in the CCE was a "very good move for Lehigh" because there might be a "great synergy between" the Office of Academic Outreach and the CCE. 7-10-19 Tr. I at 9.

187.     Until recently, Dr. Stanlick reported to Provost Farrell. 7-10-19 Tr. I at 18. He has not observed her discriminate against people of color or women. *Id.* at 18–19. He noted that a large part of her role has been relating to outreach to a very diverse community around Lehigh. *Id.* at 18.

188.     Despite agreeing to move to the Project Director position, the plaintiff believes that this position was a "lower ranked position" because she was previously a director in "college-wide, university-wide position as overseeing the Office of Academic Outreach," and was now reporting to a director and was in a center-focused position.[33] 7-8-19 Tr. I at 30; 7-10-19 Tr. I at 46.

189.     The plaintiff felt aggrieved by the change in title because she had worked hard from the time she started as a secretary at Princeton University to obtain the director position at Lehigh. 7-8-19 Tr. I at 39.

190.     Dr. Stanlick did not feel that the plaintiff's move to Project Director was a demotion. 7-10-19 Tr. II at 12.

---

[33] The plaintiff testified that she asked Mr. Halladay about whether she could maintain her director position after the transfer. 7-8-19 Tr. I at 33. Another Human Resources employee later informed the plaintiff that she could not be a director because university policy prevented a director from reporting to another director. *Id.*; 7-9-19 Tr. I at 54; *see also* 7-8-19 Tr. II at 32 (Mr. Halladay indicating that Lehigh avoids having directors report to other directors, so it is "clear what the supervisory relationship is").

191. Mr. Halladay did not feel that the plaintiff's move to the CCE was a demotion because her salary did not change, her pay grade did not change, and there were no changes in her responsibilities other than what the plaintiff negotiated with Dr. Stanlick and Dr. Odi. 7-8-19 Tr. II at 31–33. In addition, the plaintiff sought the position change and she was excited about it, so it was "hard for [Mr. Halladay] to see how that could be construed as a demotion once you know all the facts that surround it." *Id.* at 67.

192. Mr. Halladay explained that ordinarily, the plaintiff's new position with the CCE would have been classified as a Grade 10 level, but as there was no punitive action here, they agreed that the plaintiff would stay at Grade 11 and they would treat it as a lateral move. 7-8-19 Tr. II at 33; *see also* Def.'s Ex. 54.

193. The plaintiff's change of title from Director to Program Director, with no loss of salary, benefits, or seniority, did not create a hostile work environment on the basis of race or gender, either alone or in combination with other interactions that the plaintiff had at Lehigh.

194. Mr. Halladay wanted the plaintiff to feel like the new position was "a good start, a restart, a new relationship[,] a chance to really excel . . . in another part of the university in areas that she and [Dr. Stanlick] are both good at." 7-8-19 Tr. II at 34.

195. The plaintiff came over to the CCE with the S.T.A.R. Academy, the LEAPs Program, and the High School Scholars.[34] 7-10-19 Tr. II at 12.

196. The plaintiff believes that the change in her duties also was part of a demotion. 7-8-19 Tr. I at 39.

---

[34] As indicated earlier in this opinion, prior to transitioning to work at the Center for Community Engagement, the plaintiff was told that she was no longer responsible for oversight of the Fair as that responsibility was transferred to Ms. Forrest. 7-8-19 Tr. I at 31; 7-9-19 Tr. I at 158.

197.    The change in the plaintiff's duties was not part of a demotion as she continued to receive the same salary, benefits, and seniority.

198.    Concerning the S.T.A.R. Academy, after negotiating the budget for the program with Provost Farrell, Dr. Stanlick was comfortable with the budget Lehigh provided for the program.[35] 7-10-19 Tr. II at 13. They were told that the monetary commitment was guaranteed to continue for three years. *Id.*

199.    The plaintiff sent Mr. Halladay a thank you note in January 2017 for helping to orchestrate the move to working for Dr. Stanlick. 7-9-19 Tr. I at 50; Def.'s Ex. 34.

200.    It took a few months to formalize the plaintiff's move to the CCE, as the plaintiff did not officially start reporting to Dr. Stanlick until February 1, 2017.[36] 7-8-19 Tr. II at 31; 7-10-19 Tr. II at 11; *see also* Def.'s Exs. 35, 36.

---

[35] The plaintiff was uncomfortable with this budget. She claimed that the S.T.A.R. Academy budget was reduced to a third of its original budget, and she did not know the reasons for the reduction. 7-8-19 Tr. I at 60, 61, 62. The plaintiff wanted to have discussions with the appropriate individuals about the S.T.A.R. Academy budget, but Dr. Stanlick informed her that she was handling it. *Id.* at 61.

The plaintiff also testified that at some point after she obtained control of the S.T.A.R. Academy (but seemingly in December 2016), she located a letter on the department's share drive in which Dr. Odi asked the donor responsible for funding the academy not to provide any further donations to the academy. *Id.* at 59-60; *see also* Pl.'s Ex. 2. The plaintiff had no knowledge of Dr. Odi's discussions with this donor about funding for the S.T.A.R. Academy prior to seeing the letter. 7-8-19 Tr. I at 60. The plaintiff is unaware whether the donor ceased donating to the S.T.A.R. Academy. *Id.* at 60. The plaintiff never personally met with this donor. *Id.*

The court notes that Dr. Odi explained that he discussed with a donor, Bill Beattie, possibly using some of the money from his endowment for other purposes, they continued to use the money from that fund and other donated money as part of a three-year budget commitment to continue to fund the S.T.A.R. Academy after the plaintiff moved over to the CCE. Odi Dep. at 90–92; *see also* Def.'s Ex. 38 (Provost Farrell indicating he did not "doubt [Dr. Odi's] interest in using Beattie money in other ways").

Although the plaintiff indicated in her proposed findings of fact that Dr. Odi sent the letter to "University donors asking them to de-fund a student program," there is no evidence that Dr. Odi sent this letter to anyone. Even if he did, the S.T.A.R. Academy received funding (even if significantly less than the amount the plaintiff sought) for a three-year period after the plaintiff moved to the CCE and Dr. Stanlick believed that the funding was sufficient for the program. Further, even if Dr. Odi sent the letter, there is absolutely no evidence that he did so because he was discriminating against the plaintiff because of her race or gender. Also, Dr. Odi's letter (which the plaintiff only learned about by searching through the office share drive), in itself, or in conjunction with other actions taken by him or the other individuals identified by the plaintiff as discriminating against her in this lawsuit, was not discriminatory based upon race or gender and, even if it was somehow discriminatory, it was not severe or pervasive and it would not have detrimentally affected a reasonable person in like circumstances.

[36] Prior to this date, the plaintiff and Dr. Stanlick were operating as if the changes took place. *See, e.g.*, Def.'s Ex. 34 (January 2, 2017 e-mail from Mr. Halladay to plaintiff in which he references plaintiff and Dr. Stanlick smartly "working forward as if[] the changes are in place").

201.    The plaintiff's <u>voluntary</u> move to the CCE and reporting to Dr. Stanlick, did not create a hostile work environment on the basis of race or gender, either alone or in combination with other interactions that she had at Lehigh.

202.    In February 2017, the plaintiff contacted Dr. Stanlick about her desire to tell Dr. Outing how excited she was to be joining the CCE. 7-9-19 Tr. I at 52–53; Def.'s Ex. 37.

203.    The CCE was located in an office that was supposed to be a social science research center, and it included, *inter alia*, a bunch of tiny cubicles where students could work. 7-10-19 Tr. II at 15–16. There was one walled office, which Dr. Stanlick occupied. 7-8-19 Tr. II at 40.

204.    When they knew that the plaintiff would be transferring to the CCE, Dr. Stanlick and Mr. Halladay worked with the office representative to modify the cubicles into something in which a person could comfortably work.[37] 7-10-19 Tr. II at 16. This took a few months to accomplish. *Id.*

205.    The plaintiff was dissatisfied with her work space at the CCE, and she believes this new work space supports her position that she was demoted. 7-8-19 Tr. I at 32, 39. Her new work space was in the basement of the building in which the CCE was located, and she was in an area with limited space for movement. *Id.* at 32, 39.

206.    Although the plaintiff switched jobs in February 2017, she did not get to officially move over to the Center for Community Engagement until May because of the configuration of the workspace. 7-10-19 Tr. I at 49. The plaintiff felt this delay was a "red flag that something's not right here." *Id.*

---

[37] The plaintiff claims that no one from Lehigh told her that the CCE was changing the work space. 7-10-19 Tr. I at 45–46. The court does not find this testimony to be credible.

207. Dr. Stanlick did not intentionally delay the plaintiff from formally coming over to the CCE.[38] 7-10-19 Tr. II at 16. She felt that requiring the plaintiff to work in a tiny cubicle was unfair, but she still wanted the plaintiff to be in the CCE, whether that be via sharing Dr. Stanlick's office or using the larger desk table in the conference area. *Id.*

208. The delay in the plaintiff moving to the CCE or the issues with the space were not due to discrimination on the basis of the plaintiff's race or gender.

209. Overall, the plaintiff was not physically present in the CCE as often as Dr. Stanlick would have preferred, but she was there from time to time. 7-10-19 Tr. II at 17.

210. Dr. Stanlick encouraged the plaintiff to be physically present at the office there so she could become integrated into the operation. 7-9-19 Tr. I at 53; 7-8-19 Tr. II at 39; Def.'s Ex. 49. The plaintiff spent most of her time at her former office where her files and other materials were located. 7-9-19 Tr. I at 53–54. The plaintiff occasionally spent time at the conference table at the CCE. *Id.* at 54.

211. Lehigh understood that the plaintiff might not want to spend time at the office for the CCE because of the less-than-optimal work space available to her, but they still wanted her to spend as much time there as she could. 7-8-19 Tr. II at 70.

212. By late April 2017, Mr. Halladay and Dr. Stanlick were still working with Lehigh's Facilities department to improve the physical space at the CCE. 7-8-19 Tr. II at 39–40. They were told that building another walled office was cost prohibitive, so they were exploring combining the space of several student cubicles into one larger cubicle. *Id.* at 40–41.

---

[38] The plaintiff believed that Dr. Stanlick held up her move to the Center for Community Engagement for four months. 7-8-19 Tr. I at 42.

213. Assigning the plaintiff to work in a cubicle at the CCE or at the conference table there did not create a hostile work environment on the basis of race or gender, either alone or in combination with other interactions that the plaintiff had at Lehigh.

214. Even though the space was unfinished (it was supposed to be finished in mid-May), Dr. Stanlick reinforced that the plaintiff should be spending more time at the office and she needed to use the space as intended. 7-8-19 Tr. II at 42; Def.'s Ex. 49.

215. At some point, the plaintiff started speaking to Mr. Halladay about her dissatisfaction with the way Dr. Stanlick was supervising her. 7-8-19 Tr. II at 34–35. She complained that Dr. Stanlick was asking for information that she did not need to know, and the plaintiff felt that Dr. Stanlick needed to trust her to get her work done. *Id.* at 35; *see also* 7-19-19 Tr. I at 60–61 (plaintiff explaining during meeting with Dr. Stanlick that she should trust plaintiff to do her job).

216. The plaintiff also informed Mr. Halladay that she was dissatisfied about some of the budget that moved with her, and she complained that it was taking a long time for the Provost's Office to make decisions relating to the budget. 7-8-19 Tr. II at 35.

217. Dr. Stanlick felt that her relationship deteriorated with the plaintiff over trust issues. 7-10-19 Tr. II at 14–15. When Dr. Stanlick asked the plaintiff questions about her work, including questions about how her programs operated, the plaintiff responded by wondering why Dr. Stanlick was asking the questions and whether Dr. Stanlick trusted her. *Id.* at 14–15.

218. Dr. Stanlick explained that sought information about the programs from the plaintiff because she had no information as to how, for example, the High School Scholar program operates. 7-10-19 Tr. II at 15.

219. As the plaintiff's supervisor, Dr. Stanlick was also responsible for the success of the programs the plaintiff was administering, and her reputation would also be affected by the level of success of those programs. 7-10-19 Tr. II at 15.

220. Contrary to the plaintiff's allegation, Dr. Stanlick did not believe that communicating with her was difficult. 7-10-19 Tr. II at 17. She explained that she maintains a board outside of her door that shows exactly where she is at all times. *Id.*

221. The plaintiff alleges that she was dissatisfied while working at the CCE because she had limited communication with Dr. Stanlick. 7-8-19 Tr. I at 40.

222. The plaintiff did not like having Dr. Stanlick as her supervisor. 7-9-19 Tr. I at 55.

223. The plaintiff believed that Dr. Stanlick treated her like a student because, *inter alia*, she asked to receive drafts of documents that the plaintiff created. 7-9-19 Tr. I at 59–60.

224. The plaintiff had a problem reporting to Dr. Stanlick because she believes that Dr. Stanlick had only two years of professional work experience. 7-8-19 Tr. I at 40. The plaintiff "did not feel as though she ha[d] the knowledge base . . . [or] the background in employment to be able to share valuable feedback with [her]." *Id.*

225. The plaintiff claims that she attempted to have more one-on-one meetings with Dr. Stanlick and Dr. Stanlick would respond that she could not because she was very busy and had a lot of meetings outside of the office. 7-8-19 Tr. I at 40. The plaintiff asserts that Dr. Stanlick would communicate with the plaintiff by e-mail instead of in person. *Id.* at 40–41.

226. Dr. Stanlick did not try to get other people to not work with the plaintiff. 7-10-19 Tr. II at 18.

227. Dr. Stanlick did not try to steal the plaintiff's contacts and relationships with community outreach partners, despite the plaintiff's allegation to the contrary.[39] 7-10-19 Tr. II at 18–19; 7-9-19 Tr. I at 59; Pl.'s Dep. at 156.

228. Dr. Stanlick did not harbor any hostility toward the plaintiff because of her race or gender. 7-10-19 Tr. II at 27.

229. Shortly after Dr. Outing started at Lehigh, the plaintiff informed him that she was having issues with Dr. Stanlick. 7-9-19 Tr. I at 57, 107. Although the plaintiff told Dr. Stanlick that she would be meeting with Dr. Outing, she did not tell her that she would be complaining about her to Dr. Outing. *Id.* at 57.

230. The plaintiff informed Dr. Outing that she was concerned with her work environment because she was working in a cubicle. 7-9-19 Tr. I at 107. She also felt that Dr. Stanlick micromanaged her. *Id.* She told him that she felt being moved from her office to this cubicle area was a sort of punishment or form of retaliation by the Provost because of complaints she raised about Dr. Odi. *Id.* at 108.

231. Regarding the plaintiff's disapproval of Dr. Stanlick's management style, she did not like the weekly meetings where Dr. Stanlick would ask the plaintiff about topics such as timelines, schedules, and budgets. 7-9-19 Tr. I at 110. The plaintiff felt that Dr. Stanlick was

---

[39] In her proposed findings of fact and conclusions of law, the plaintiff references having positively worked as Lehigh's contact for community-based projects with the Bethlehem Area School District for five years. Pl.'s Findings and Conclusions at ¶ 41. She asserts that Dr. Stanlick told her that Provost Farrell wanted Dr. Stanlick to serve as the contact person, and Dr. Stanlick relayed that she was now the contact person to the school district's contact without first informing the plaintiff of this change. *Id.*

    The court notes that although the plaintiff testified about her history working with the contact person for the school district, the testimony ceased after an objection to further testimony about what the contact person may have told the plaintiff. 7-8-19 Tr. I at 65–66. The only other evidence relating to this topic is in the notes the plaintiff provided as an exhibit (and for which she did not reference during her testimony at trial). *See* Pl.'s Ex. 19. Regardless, even if Dr. Stanlick became Lehigh's contact person for the Bethlehem Area School District, there is no evidence that this occurred because Lehigh was discriminating against the plaintiff because of her race or gender, either in isolation, or in conjunction with other events that occurred at Lehigh.

hovering over her and asking too many questions about day-to-day operations. *Id.* She felt that she had sufficient experience and "should be just left to do it." *Id.* She also felt that Dr. Stanlick would not be asking her about these things if she was not an African-American woman. *Id.* at 111.

232.   Dr. Outing informed the plaintiff that he supported her move to work with Dr. Stanlick as it was a good opportunity for her to work in a new environment and start fresh with a new supervisor. 7-9-19 Tr. I at 108.

233.   Dr. Outing explained to the plaintiff that he felt that Dr. Stanlick was not making unreasonable requests to her as a supervisor and he shared with her his own management style where he asks for reports and periodically meets with his directors to get updates. 7-9-19 Tr. I at 110.

234.   Dr. Outing informed the plaintiff to focus on doing well with Dr. Stanlick, and to take advantage of the opportunity. 7-9-19 Tr. I at 58, 108.

235.   Dr. Outing did not believe that the plaintiff's transfer to work with Dr. Stanlick was a punishment because it was "a good remedy to the tense environment that was existing over there in that house between" the plaintiff and Dr. Odi. 7-9-19 Tr. I at 109.

236.   After his conversation with the plaintiff, Dr. Outing met with Dr. Stanlick to let her know that the plaintiff was unhappy with the supervisory nature of their relationship and this was now out in the Lehigh community. 7-9-19 Tr. I at 111–12; 7-10-19 Tr. II at 20–21. Dr. Stanlick was disappointed to hear about the plaintiff's complaints from outside sources. 7-10-19 Tr. II at 21. Based on this conversation and what Dr. Outing knew about the plaintiff's relationship with Dr. Odi, he suggested to Dr. Stanlick that she confer with Human Resources to get a third party to sit in on meetings between her and the plaintiff. 7-9-19 Tr. I at 112.

237.     Dr. Stanlick approached Mr. Halladay and informed him that she was surprised that she was having so much difficulty with the plaintiff insofar as the plaintiff was not engaging with her as she expected and was not sharing information. 7-8-19 Tr. II at 36. Dr. Stanlick was also frustrated with having to repeatedly ask the plaintiff for updates on the status of projects. *Id.* at 36–37.

238.     By the end of April 2017, Dr. Stanlick was communicating with Ms. Zavalydriga about her concerns regarding the plaintiff being unhappy with her transition to the CCE.[40] 7-8-19 Tr. II at 37; Def.'s Ex. 49. Dr. Stanlick asked that Mr. Halladay become more involved in the situation. 7-8-19 Tr. II at 37; Def.'s Ex. 49.

239.     The plaintiff informed Dr. Stanlick that she had been harassed at Lehigh for the past five years and warned her that she was documenting all future harassment. 7-9-19 Tr. I at 61–63; Pl.'s Dep. at 162.

240.     The plaintiff informed Dr. Stanlick that she felt Dr. Odi's interactions with her were based upon her race and color. 7-9-19 Tr. I at 63.

241.     Dr. Stanlick reached out to Attorney Salvemini and relayed the plaintiff's concerns about harassment and discrimination relating to her time under Dr. Odi. 7-9-19 Tr. I at 65; 7-10-19 Tr. II at 23, 38–39. The plaintiff believes that Dr. Stanlick's conduct in this regard was discriminatory because she purportedly did not do it on her behalf and she never asked Dr. Stanlick to assist her. 7-9-19 Tr. I at 65. The plaintiff "did not trust that Dr. Stanlick truly cared about how [she] felt there at Lehigh." 7-10-19 Tr. I at 40. She felt that Dr. Stanlick made the report in bad faith. 7-10-19 Tr. I at 50–51.

---

[40] Dr. Stanlick had shared that she learned from Dr. Outing and Adrienne Washington, both African-American men, that the plaintiff was unhappy with the transition. 7-8-19 Tr. II at 38; Def.'s Ex. 49.

242.     Contrary to the plaintiff's claims, Dr. Stanlick made the report to Attorney Salvemini because it was incumbent on her to report the plaintiff's concerns, and she wanted her to know what resources were at Lehigh if the plaintiff needed to talk through any issues. 7-10-19 Tr. II at 23.

243.     Mr. Halladay noted that if a supervisor heard from a supervisee that the supervisee felt racially harassed by another person on campus, "[i]t would be expected and probably obligatory" for the supervisor to notify the Equal Opportunity Compliance Office about this. 7-8-19 Tr. II at 39.

244.     Although Attorney Salvemini indicated that it was possible that a supervisor could tender a report of a supervisee expressing complaints of discrimination in bad faith, 7-10-19 Tr. II at 40, Dr. Stanlick did not act in bad faith or with a discriminatory animus in reporting the plaintiff's complaints about Dr. Odi to Attorney Salvemini.

245.     The plaintiff received an e-mail from Attorney Salvemini to inquire whether she wanted to discuss the issues identified by Dr. Stanlick. 7-8-19 Tr. I at 67; 7-9-19 Tr. I at 63–65; Def.'s Ex. 50; 7-10-19 Tr. II at 39. Attorney Salvemini's e-mail indicated that Dr. Stanlick had reached out to her about the plaintiff's concerns over how she had been treated, so Attorney Salvemini offered to meet with the plaintiff so the plaintiff could discuss her concerns in more detail. 7-10-19 Tr. II at 39.

246.     The plaintiff informed Attorney Salvemini that she did not want to meet with her. 7-8-19 Tr. I at 67; 7-9-19 Tr. I at 65, 66; 7-10-19 Tr. I at 40, 68; 7-10-19 Tr. II at 39; Def.'s Ex. 50. She felt that she had already relayed her concerns and allegations of mistreatment to senior

administration officials at Lehigh and she did not want to repeat the experience to another person who already knew about her situation.[41] 7-10-19 Tr. I at 40.

247. Lehigh has comprehensive nondiscrimination and nonharassment policies which, *inter alia*, prohibit discrimination on the basis of race and gender, and Attorney Salvemini is responsible for investigating and remedying inappropriate discriminatory conduct and harassment. 7-9-19 Tr. I at 65; Def.'s Ex. 76.

248. Lehigh's harassment and nondiscrimination policy provides that supervisors are required to immediately report incidents of harassment and discrimination to the Equal Opportunity Compliance Coordinator, who also serves as Lehigh's Title IX coordinator. 7-9-19 Tr. I at 81–82; Def.'s Ex. 76; 7-10-19 Tr. II at 36–37.

249. The plaintiff received training on Lehigh's policy on harassment and nondiscrimination. 7-9-19 Tr. I at 81; Def.'s Ex. 76.

250. There is no evidence in the record that Lehigh's harassment and nondiscrimination policies, and the complaint and investigation procedure, are ineffective or unreasonable policies and procedures to promptly prevent and correct any race-based or sex-based harassment. To the contrary, they are effective and reasonable policies and procedures to promptly prevent and correct any race-based or sex-based harassment.

251. The plaintiff unreasonably disagrees that it is appropriate for a supervisor to reach out to Attorney Salvemini when someone was feeling subjected to discrimination. 7-9-19 Tr. I at 66–67.

---

[41] There is no evidence in the record that the plaintiff indicated to anyone at Lehigh that she believed that Dr. Odi had discriminated against her based on her race or gender or that he otherwise harassed her because of her race or gender, prior to her statements to Dr. Stanlick.

252.     Dr. Stanlick's report to Karen Salvemini, along with Karen Salvemini reaching out to the plaintiff to see if she wanted to discuss the issues about race-based discrimination or harassment she relayed to Dr. Stanlick, did not create a hostile work environment on the basis of race or gender, either alone or in combination with other interactions that the plaintiff had at Lehigh.

253.     The plaintiff had the opportunity to make a complaint of race or gender discrimination or harassment to Attorney Salvemini, Lehigh's Equal Opportunity Compliance Coordinator and Title IX Coordinator, but she declined to do so. 7-10-19 Tr. II at 39.

254.     In mid-May 2017, Dr. Stanlick informed the plaintiff that she needed to complete her first "draft book" for a performance review.[42] 7-8-19 Tr. II at 43; Def.'s Ex. 53.

255.     It was typical for Dr. Stanlick to use the draft book, and Mr. Halladay probably told Dr. Stanlick that she needed to use the draft book as her "tool to help clarify expectations and monitor progress." 7-8-19 Tr. II at 43–44.

256.     On May 17, 2017, the plaintiff e-mailed Dr. Stanlick that she was hoping to go to the Lehigh Valley Women's Summit on June 7, 2017. 7-9-19 Tr. I at 70–71; 7-10-19 Tr. II at 19; Def.'s Ex. 55. Dr. Stanlick told her that she could go and would not be charged with using a vacation day, even though the summit was unrelated to the plaintiff's job with the CCE. 7-9-19 Tr. I at 71; 7-10-19 Tr. II at 19–20; Def.'s Ex. 55.

---

[42] The "draft book" is Lehigh's performance management system in which they have quarterly check-ins and a yearly evaluation to "see how things were done and to work on next year's goals." 7-8-19 Tr. II at 43.

     The court notes that the plaintiff testified that after ten days of working at the CCE, Dr. Stanlick told her that she wanted to conduct a performance review. 7-8-19 Tr. I at 42. Unfortunately, the plaintiff did not clarify her testimony as to when this request occurred, and it appears from the record (as the court already found) that the plaintiff started doing some work with Dr. Stanlick as early as November/December 2016 and was formally working under Dr. Stanlick by February 1, 2017. Yet, the testimony also appeared to show that the plaintiff's physical move to the CCE occurred in early May 2017. At bottom, it is unclear whether the plaintiff is asserting that Dr. Stanlick referenced a performance review prior to May 2017, especially since the plaintiff's complaint was that Dr. Stanlick had not supervised her for a sufficient period of time to be able to evaluate the quality of her work and the progress she was making. *Id.* It would appear though that the plaintiff is referring to Dr. Stanlick's request in May 2017.

257.    DNA Day was a community outreach program run by a former Lehigh faculty member, Krystal McLaughlin. 7-10-19 Tr. II at 17–18. The plaintiff had been working on that program with Ms. McLaughlin, and Dr. Stanlick wanted to make it more concrete under the CCE. 7-10-19 Tr. II at 18. Although the plaintiff told Dr. Stanlick that she had it under control, Ms. McLaughlin informed Dr. Stanlick that she was frustrated with the plaintiff and, ultimately, took the program to Moravian College because she did not trust that it would be "shepherded well." 7-10-19 Tr. II at 18.

258.    On May 26, 2017, the plaintiff, Dr. Stanlick, and Mr. Halladay met to discuss the plaintiff and Dr. Stanlick's work issues. 7-8-19 Tr. II at 44–45; 7-9-19 Tr. I at 71; 7-10-19 Tr. II at 22.

259.    During the meeting, Dr. Stanlick went first and mentioned that there are trust issues. 7-8-19 Tr. II at 45. Then, for the rest of the first half of the meeting, the plaintiff mostly spoke about what Dr. Stanlick was inappropriately doing or how she was inadequately supervising her. *Id.* Regarding supervision, the plaintiff complained that Dr. Stanlick was micromanaging her. *Id.* Although the plaintiff did not raise her voice during the meeting, she "was accusing [Dr. Stanlick] of doing a number of things and attributing motivations to those behaviors as well." *Id.* at 46. These motivations included Dr. Stanlick trying to push the plaintiff out of her job. *Id.*

260.    During the meeting, Dr. Stanlick tried to defend herself, explain why she was doing what she was doing, why it was appropriate for her to do so, and what she was asking of the plaintiff. 7-8-19 Tr. II at 47.

261.    There was no discussion of a performance improvement plan during this meeting. 7-8-19 Tr. II at 48.

262.     Mr. Halladay, the plaintiff, and Dr. Stanlick were unable to reach an agreement "on much" during the meeting. 7-8-19 Tr. II at 48–49.

263.     Mr. Halladay left the meeting with more "homework" to do, so his plan was to talk to various stakeholders to get input on "how we could get to a place where they would agree on expectations and delivery of expectation[s]." 7-8-19 Tr. II at 49.

264.     After the meeting, the plaintiff went home for the day. 7-9-19 Tr. I at 71–72.

265.     On May 30, 2017, the plaintiff sent an e-mail to Mr. Halladay (copying Dr. Stanlick), in which she, *inter alia*, (1) stated that following the May 26, 2017 meeting (and due to the "accusations and tone" of the meeting), she did not want to have one-on-one meetings with Dr. Stanlick, (2) she was no longer comfortable attending a conference that Dr. Stanlick was presenting at Lehigh, and (3) she did not want to participate in the upcoming draft book evaluation. 7-8-19 Tr. II at 50–52; 7-9-19 Tr. I at 72; Def.'s Ex. 63.

266.     Dr. Stanlick responded to the plaintiff's e-mail by e-mailing Mr. Halladay (and not copying the plaintiff) and informing him that, *inter alia*, (1) she agreed that one-on-one meetings would not be productive without a representative from Human Resources being present, (2) she still expected the plaintiff to complete the self-assessment portion of the draft book, but they should review the self-assessment with the Human Resources representative present, and (3) the plaintiff should attend the conference because it would be a good opportunity for her. 7-8-19 Tr. II at 52–53; 7-9-19 Tr. I at 72; 7-10-19 Tr. II at 25; Def.'s Ex. 63.

267.     The plaintiff acknowledges meeting with a supervisor one-on-one, attending a conference the supervisor was facilitating, or discussing job performance are all normal things a supervisor would expect an employee would do without questioning. 7-9-19 Tr. I at 72.

268.     Following Dr. Stanlick's e-mail, Mr. Halladay e-mailed the plaintiff on May 31, 2017.[43] 7-8-19 Tr. II at 53–54; Def.'s Ex. 63.

269.     In this May 31, 2017 e-mail, Mr. Halladay indicated, *inter alia*, that he agreed that the plaintiff and Dr. Stanlick should not meet one-on-one without the presence of a third party. 7-8-19 Tr. II at 54; Def.'s Ex. 63. In addition, he disputed the plaintiff's characterization of the meeting and explained that it did not involve "one-sided accusations directed" at the plaintiff; instead, the meeting involved the plaintiff being "much more the aggressor" than Dr. Stanlick. 7-8-19 Tr. II at 54–55; Def.'s Ex. 63.

270.     Mr. Halladay also indicated that the plaintiff should attend the conference and participate in the performance review process with a neutral party (probably from Human Resources) being present. 7-8-19 Tr. II at 55–56; 7-9-19 Tr. I at 73; Def.'s Ex. 63. He told the plaintiff that Dr. Stanlick was the supervisor and the plaintiff was the supervisee, and Dr. Stanlick had the right and responsibility to make the plaintiff perform the work she wanted her to do. 7-9-19 Tr. I at 73–74. He also indicated that the draft book meeting needed to occur because (1) it would clarify expectations and (2) the plaintiff had expressed to him her disappointment in Dr. Odi's supervision because he did not give her annual evaluations. 7-8-19 Tr. II at 56; Def.'s Ex. 63.

271.     Mr. Halladay also clarified to the plaintiff that he did not say that her relationship with Dr. Stanlick was irreparable; instead, he said he was concerned that their relationship might not be reparable. 7-8-19 Tr. II at 56–57; Def.'s Ex. 63.

272.     The plaintiff alleged that the tone and content of Mr. Halladay's e-mail to her, including the statement that she was in a "supervisor/supervisee relationship with Sarah," was part

---

[43] Mr. Halladay did not blind copy anyone else on this e-mail. 7-8-19 Tr. II at 54; *see also* 7-10-19 Tr. II at 26 (Dr. Stanlick testifying that she did not receive this e-mail from Mr. Halladay).

of the hostile environment on the basis of race and gender to which Lehigh subjected her. Compl. at ¶ 12; Def.'s Ex. 2, Pl.'s Answers to Interrogs.

273.    Mr. Halladay's e-mail to the plaintiff, including the reference to the plaintiff being in a "supervisor/supervisee relationship with Sarah," did not create a hostile work environment insofar as it was not discriminatory based upon the plaintiff's race or gender, and even if it was, it was not so severe or pervasive that it would have detrimentally affected a reasonable person in similar circumstances. To the contrary, Mr. Halladay was stating the obvious, that Dr. Stanlick was the plaintiff's supervisor and that was the structure of their work relationship.

274.    Mr. Halladay believed that Dr. Stanlick was making reasonable requests to the plaintiff. 7-8-19 Tr. II at 36.

275.    Dr. Stanlick's requests to the plaintiff and her expectations for the plaintiff were reasonable and not discriminatory based on the plaintiff's race or gender.

276.    After his e-mail to the plaintiff, Mr. Halladay (as he had indicated to the plaintiff in his e-mail), sent an e-mail to the plaintiff and Dr. Stanlick in which he stated that, *inter alia*, (1) the plaintiff and Dr. Stanlick should only meet if third parties are present, (2) the plaintiff should attend the conference, and (3) they should proceed with the draft book while having a third party present. 7-8-19 Tr. II at 57–58; Def.'s Ex. 63.

277.    In this e-mail, Mr. Halladay indicated that he "would like to begin an inquiry into the situation and what kind of go forward tactics might work. That means I will ask someone to spend some time with each of you to understand the situation. I will also ask them to look broadly at the situation, the stakeholders, the Lehigh programs and investments involved, etc." 7-8-19 Tr. II at 58–59; Def.'s Ex. 63; *see also* 7-8-19 Tr. I at 67.

278.    Mr. Halladay used the word "inquiry" in his e-mail to indicate that he is "trying to find solutions to a situation" and it did not reference investigating any wrongdoing.[44] 7-8-19 Tr. II at 59, 70, 71.

279.    Even though Mr. Halladay acknowledges that it is potentially possible that a person could see the word "inquiry" in his e-mail and believe that they are in trouble, 7-8-19 Tr. II at 71, there is nothing about his e-mail to the plaintiff to indicate that he was investigating her for wrongdoing or with a goal to proceed with any possible disciplinary action. Moreover, no reasonable reading of this portion of Mr. Halladay's e-mail would cause a reasonable reader to believe that anyone was being investigated for wrongdoing and possible termination. Rather, it is obvious that Mr. Halladay was attempting to gather more information to assist with resolving the workplace issues between the plaintiff and Dr. Stanlick.

280.    The plaintiff responded to Mr. Halladay by telling him that she would look forward to the meetings and would attend the conference. 7-9-19 Tr. I at 88–90; Def.'s Ex. 63. Yet, later that evening, the plaintiff e-mailed Dr. Outing and told him that she was planning on resigning the following day. 7-9-19 Tr. I at 90; Def.'s Ex. 68.

281.    Although there were moments where he believes that Dr. Stanlick could have communicated more effectively with the plaintiff, Mr. Halladay believes that "the majority of the

---

[44] The plaintiff was not sure if Mr. Halladay used the word "inquiry" in conversation between them, 7-9-19 Tr. I at 83–84; nonetheless, the court does not find that he was intending to conduct any "inquiry" into the plaintiff as she described in her testimony (as some sort of precursor to Lehigh terminating her employment).
        The court also notes that unlike at her deposition, *see* Pl.'s Dep. at 180, the plaintiff at trial identified a Lehigh employee who was subjected to an inquiry and ultimately fired. 7-9-19 Tr. I at 87. She identified the individual as the former Registrar, Emil Nassau. *Id.* The plaintiff testified that he is a person of color "in [her] estimation." *Id.*
        Regardless of whether this "inquiry" into Mr. Nassau occurred, the plaintiff has not credibly testified that Mr. Halladay or anyone else at Lehigh conducted an "inquiry" into her for the purpose of ultimately terminating her employment. Further, Mr. Halladay's e-mail is clear that the purpose of the inquiry was to foster a positive and productive relationship between the plaintiff and Dr. Stanlick. Def.'s Ex. 63.

issues [between the plaintiff and Dr. Stanlick] seem[ed] to emanate from [the plaintiff] not wanting to be supervised in what [he] felt were basic supervisory behaviors." 7-8-19 Tr. II at 68.

282.    The plaintiff voluntarily resigned from her position at Lehigh University via a letter dated June 1, 2017. 7-8-19 Tr. I at 74–75. Def.'s Ex. 69. She delivered the letter to Mr. Halladay and Dr. Stanlick. 7-8-19 Tr. I at 74, 75; Def.'s Ex. 69.

283.    In the resignation letter, the plaintiff attempted to make her resignation effective as of August 31, 2017. 7-8-19 Tr. I at 75–76; Def.'s Ex. 69.

284.    In her resignation letter, the plaintiff wanted to continue working at Lehigh for approximately three months and get paid for this period of time even though she is claiming that the conditions were so bad there that she had to resign, and that any reasonable person would have had to resign.[45] 7-8-19 Tr. I at 77.

285.    The plaintiff asserts that she felt compelled to resign from her position at Lehigh because it was possible that Lehigh might fire her insofar as two other former Lehigh employees (whom the plaintiff believed to be credible) told her that an audit or inquiry is used to eventually fire an employee. 7-8-19 Tr. I at 70.

286.    Mr. Halladay was surprised to hear of the plaintiff's resignation on June 1, 2017. 7-8-19 Tr. II at 60.

287.    Dr. Stanlick was surprised that the plaintiff had resigned as she was committed to trying to work through the situation with the plaintiff. 7-8-19 Tr. II at 60; 7-10-19 Tr. I at 50; 7-

---

[45] The court notes that upon defense counsel initially questioning the plaintiff about whether she intended to stay at Lehigh for three months despite the conditions being so bad that she or any other reasonable person would feel compelled to resign, the plaintiff responded by stating that she wanted to remain at Lehigh during this period because she wanted to complete her work with the S.T.A.R. Academy. 7-8-19 Tr. I at 76; 7-10-19 Tr. I at 30–31. The plaintiff's e-mail to Mr. Halladay enclosing her resignation letter appears to directly contradict this testimony as she specifically indicated in the e-mail that she felt that "[w]ith [her] impending departure from the university, [she has] been thinking that it is in the best interest of the S.T.A.R. Academy program if [she] not be the staff person to implement the camp this summer." Def.'s Ex. 69.

10-19 Tr. II at 27. Nonetheless, she acknowledged that her working relationship with the plaintiff had deteriorated to the point that Dr. Stanlick felt that "the only way that [they] could move forward was through more official channels and trying to figure that out through HR." 7-10-19 Tr. II at 29–30.

288.   The plaintiff's act of giving notice that she was resigning in three months, while also indicating that she would transition all her work to someone else before then, was unusual. 7-8-19 Tr. II at 60–61.

289.   Mr. Halladay responded to the plaintiff's e-mail and resignation letter by stating, *inter alia*, (1) Lehigh could support a resignation date of June 30, 2017, (2) during the time that the plaintiff remained at Lehigh, she would transition responsibility for her programs to someone else, and (3) after transitioning the work, the plaintiff would not be expected to be physically at work, but would need to be available by phone.[46] Def.'s Ex. 69.

290.   Essentially, Lehigh allowed the plaintiff to remain at home until June 30, 2017, while continuing to be paid. 7-8-19 Tr. I at 81.

291.   When the plaintiff resigned, Ms. Forrest was part of a group, including Dr. Stanlick, compiled to run the S.T.A.R. Academy for that summer. 7-9-19 Tr. I at 159–62; 7-10-19 Tr. II at 27–28. They had a significant amount of work to do, and the camp was starting in a couple of weeks. 7-9-19 Tr. I at 162. They completed everything as best as they could, and they believe that the camp went well. *Id.* at 163.

292.   The plaintiff transitioned her work quickly, but Lehigh still let her remain on salary until the end of the month. 7-8-19 Tr. II at 61.

---

[46] Although the plaintiff testified at her deposition that she found Mr. Halladay's response to her resignation letter to be reasonable, she would not "agree to that" at trial. *Compare* 7-8-19 Tr. I at 79–80, *with* Pl.'s Dep. at 188. This court finds Mr. Halladay's response to be reasonable.

293.    Ms. Lefever invited the plaintiff to participate in an exit interview, but the plaintiff declined to participate. 7-8-19 Tr. I at 81; 7-8-19 Tr. II at 77, 78; Def.'s Ex. 72.

294.    Dr. Stanlick's supervision of the plaintiff did not create a hostile work environment on the basis of race or gender, either alone or in combination with other incidents.

295.    Dr. Stanlick did not harbor any discriminatory animus against the plaintiff on the basis of either her race or gender.

296.    Mr. Halladay did not harbor any discriminatory animus against the plaintiff on the basis of either her race or gender.

### E.    Miscellaneous Findings

297.    From June 2011 until June 2016, Tyrone Russell ("Mr. Russell") worked as the Director of Multicultural Affairs at Lehigh. 7-9-19 Tr. I at 78. He supervised the programming efforts for students of color and developed and built policies related to fairness and equity. *Id.*

298.    Mr. Russell worked with the plaintiff and found working with her to be delightful in all their encounters. 7-9-19 Tr. I at 78. He also observed the plaintiff interacting with other colleagues in a helpful and collaborative manner. *Id.* at 79.

299.    Mr. Russell primarily worked with the plaintiff on Umoja House, and he found that their work together generally positively contributed to the goals in his job. 7-9-19 Tr. I at 80.

300.    During the time that Leon Washington worked at Lehigh, he never regretted Lehigh offering the director position to the plaintiff. 7-10-19 Tr. I at 60. Mr. Washington and the plaintiff worked together "quite a bit" on various projects; they were co-chairs of the FSCN for two years, and they both served on the CEC for at least four years.[47] *Id.*

---

[47] Mr. Washington's testimony about serving as a co-chair with the plaintiff is inconsistent with the other testimony, including the plaintiff's own testimony, that she was a liaison to the FSCN.

301.  Mr. Washington did not experience difficulties working with the plaintiff. 7-10-19 Tr. I at 61–62. He was never her supervisor. *Id.* at 63.

302.  Mr. Washington was unaware of the plaintiff having issues with more than a few people on campus and thought that she and Dr. Odi had resolved their issues about the plaintiff's responsibilities. 7-10-19 Tr. I at 62.

303.  Mr. Washington believed that the plaintiff positively contributed to Lehigh's pursuit of its goals. 7-10-19 Tr. I at 62.

304.  Holona Ochs, Ph.D. ("Dr. Ochs") is currently an Associate Professor and Graduate Director in the Political Science Department. 7-10-19 Tr. I at 64.

305.  Dr. Ochs served with the plaintiff on the FSCN. 7-10-19 Tr. I at 65. She also worked with the plaintiff on a few projects, including a multi-year research project at Lehigh. *Id.* at 65–66.

306.  Dr. Ochs did not observe any friction or conflict between the plaintiff and any members of the research project. 7-10-19 Tr. I at 67. She was not aware of any complaints against the plaintiff. *Id.*

307.  The plaintiff feels that she was well-liked at Lehigh. 7-10-19 Tr. I at 75.

308.  Based on his experience and observations at a distance, Provost Farrell believed that the plaintiff would have difficulty working with anyone at Lehigh because it "seemed to be a common theme across a number of different environments with a number of different individuals." 7-10-19 Tr. I at 14.

309.  Provost Farrell observed that the plaintiff was resistant to supervision and authority. 7-10-19 Tr. I at 20. Provost Farrell noted that supervisors are supposed to provide their supervisees

with instruction and the supervisees are expected to follow those instructions. 7-10-19 Tr. I at 21–22.

310.    When the plaintiff left places of employment in higher education prior to concluding her employment with Lehigh, she never left those institutions in a manner that could be viewed as a constructive discharge. 7-8-19 Tr. I at 38.

311.    The plaintiff "wanted to be able to interact with, be supported by[,] and have the assistance of supervisors who . . . interact[ed] with [her], contact[ed] . . . [her] and wanted to work with [her]." 7-8-19 Tr. I at 41. The plaintiff felt that she did not have that at Lehigh. *Id.*

312.    The plaintiff testified that

> I'm not saying that Dr. Odi or anyone else who made my experience at Lehigh extremely unpleasant are bad people. I'm not saying they're the devil, but what I am saying is that there was a concerted effort at making me feel a particular negative way at Lehigh University. And I could not endure the attitudes and the treatment any longer when I resigned from my position there. It was as if Dr. Odi and those who were closely connected with him and the provost in some way felt truly that I wasn't worthy of being in my position or being in a position at Lehigh. And the treatment and the attitudes were reflective of that.

7-8-19 Tr. I at 45.

313.    There was no collective or concerted effort from employees at Lehigh, particularly the individuals mentioned in this case, to make the plaintiff feel a negative way, nor did they intentionally treat the plaintiff in a way to make her feel that she was unworthy of her position at Lehigh.

314.    The plaintiff indicated that she suffered from negative health effects due to her treatment at Lehigh.[48] 7-8-19 Tr. I at 45–46. She resigned in part because she "wasn't willing to

---

[48] The plaintiff acknowledged that a medical professional did not link any health problems to her experience at Lehigh. 7-8-19 Tr. I at 46.

put [her]self in that position of being emotionally and possibly physically impacted by the incidents that [she] experienced over the five years there at Lehigh." *Id.* at 46.

315. Since leaving Lehigh, the plaintiff is "doing very well" health-wise. 7-8-19 Tr. I at 49.

316. Although the plaintiff claims to have suffered from emotional distress at Lehigh, she has never been treated by a psychologist, psychiatrist or other medical mental healthcare provider. 7-8-19 Tr. I at 94. The plaintiff has never taken medication for depression or anxiety. *Id.*

317. The plaintiff seeks damages for having to purchase an Apple laptop and printer that she needed to pursue this litigation. 7-8-19 Tr. I at 94–95.

318. The plaintiff believes that there were two instances at Lehigh where she felt she was being encouraged to leave. 7-8-19 Tr. I at 68. The first was when she asserts that Ms. Forrest told her that if the plaintiff ever left Lehigh, Dr. Odi would give the plaintiff's job to Ms. Forrest. *Id.* The second instance was when Dr. Odi yelled at her and told her that she would not be successful at Lehigh if she disagreed with leadership. *Id.*

319. In 2014 and 2016, the plaintiff received a staff award and was recognized in front of the university community. 7-8-19 Tr. I at 68. The plaintiff also received an award for being part of the 25 women changing Lehigh. *Id.*

320. Lehigh did not fire the plaintiff or otherwise subject the plaintiff to an adverse employment action. 7-8-19 Tr. I at 74.

321. Lehigh never disciplined the plaintiff. 7-8-19 Tr. I at 74.

322. The plaintiff was not subjected to physical abuse or sexual harassment while at Lehigh. *See, e.g.*, 7-18-19 Tr. at 74.

323.     Lehigh never threatened the plaintiff with discharge, encouraged her to resign, demoted her, subjected her to reduced pay or benefits, involuntarily transferred her to a less desirable position, or gave her unsatisfactory performance evaluations. To the extent that the plaintiff lost any of her job responsibilities, she did so because she either voluntarily ceased performing the work (such as her work with Umoja House) or because of a non-race- or gender-based reason, such as the transfer of responsibility for the Fair because Mr. Haines wanted Jill Forrest to be responsible for it.

324.     The plaintiff "never had an experience where someone [at Lehigh] said that they were harassing [her] due to [her] race."[49] 7-8-19 Tr. I at 74.

325.     The plaintiff claims to have had a wonderful working relationship with every employer other than Lehigh. 7-8-19 Tr. I at 85–86.

326.     The plaintiff claims that Mr. Halladay, Ms. Forrest, Ms. Mann, and Dr. Stanlick discriminated against her based on her African-American race and female gender. 7-8-19 Tr. I at 102.

327.     The plaintiff is unaware of any statements or conduct on behalf of Mr. Halladay, Ms. Forrest, Ms. Mann, or Dr. Stanlick evidencing discrimination against African-Americans or women generally. 7-8-19 Tr. I at 103-05. Her only purported instances of discrimination involve their interaction with her. 7-8-19 Tr. I at 103–05.

328.     The plaintiff claims that Ms. Forrest discriminated against her by creating a hostile environment because she filed a "bogus" Title IX complaint against the plaintiff and said to the plaintiff that Dr. Odi promised her the plaintiff's job if the plaintiff left Lehigh. 7-8-19 Tr. I at 103; 7-9-19 Tr. I at 36.

---

[49] The court recognizes that the plaintiff feels that she was harassed on account of her race. 7-8-19 Tr. I at 74.

329. Even though Provost Farrell ultimately determined that Ms. Forrest's complaint did not rise to a Title IX violation for retaliation, Ms. Farrell's complaint emanated out of what she believed in good faith were difficult working circumstances with the plaintiff and not due to race- or gender-based discrimination.

330. The plaintiff claims that Mr. Halladay discriminated against her as an African-American by referring to her as being extremely aggressive. 7-8-19 Tr. I at 104.

331. Mr. Halladay's statement about the plaintiff being the aggressor in the meeting with Dr. Stanlick was his observation of her actions and was not based on the plaintiff's race.

332. Lehigh had to garnish the plaintiff's wages because she defaulted on her student loan debt. 7-9-19 Tr. I at 20–21, 126–27; Def.'s Ex. 10. The plaintiff felt that Human Resources was targeting her in taking money from her account. 7-9-19 Tr. I at 127.

333. There is no credible evidence that Human Resources targeted the plaintiff (much less targeted her because of her race or gender) by garnishing her wages after she defaulted on her student loans.

334. Ms. Zavalydriga had numerous interactions with the plaintiff, starting with the issues the plaintiff had with Dr. Odi and continuing through the issues that she had with Dr. Stanlick. 7-10-19 Tr. II at 42–45. In her 30 years as a Human Resources professional, Ms. Zavalydriga felt that the plaintiff "was impossible to satisfy . . . [and] was the most difficult client [she had] ever worked with." 7-10-19 Tr. II at 45.

335. None of the interpersonal conflicts that the plaintiff had with other employees at Lehigh constituted discrimination on the basis of either race or gender.

336. Lehigh did not treat the plaintiff differently from white people or men on the basis of her race or gender.

337.    The plaintiff is unaware of Lehigh subjecting any white men, white women, or African-American men to the hostile conditions she was subjected to at Lehigh. 7-10-19 Tr. I at 8.

338.    The plaintiff was not subjected to hostile conditions because of her race or gender while at Lehigh.

339.    The plaintiff alleges the hostile actions taken against her included the change in her duties, change of work space, change of title, minimal or no communication on a daily basis by supervisors, and the bogus Title IX complaint. Transcript of Specific Witness Testimony, July 11, 2019 ("7-11-19 Tr. I") at 8–9, Doc. No. 36.

340.    The plaintiff believes that having increased interaction with Dr. Stanlick and Dr. Odi would have allowed her to produce better for Lehigh and create better outcomes. 7-11-19 Tr. I at 15–16.

341.    The plaintiff's statements about wanting more communication from Dr. Stanlick are inconsistent with her complaints of Dr. Stanlick micromanaging her, wanting to know more about the plaintiff's programs and work, and Dr. Stanlick's weekly meetings.

342.    During her time at Lehigh, the plaintiff never received a written performance evaluation. 7-8-19 Tr. I at 28. Yet, when Dr. Stanlick asked the plaintiff to participate in the beginning of that process, the plaintiff refused.

343.    The plaintiff does not feel that she received sufficient funding for her work at Lehigh. 7-8-19 Tr. I at 60.

344.    At the time the plaintiff resigned from Lehigh, she was earning $88,000 per year. 7-10-19 Tr. I at 32.

345.    After resigning from Lehigh, the plaintiff worked at ChildFirst Services in Allentown as its deputy chief executive officer from September 2017 to May 2018. 7-8-19 Tr. I at

93; Def.'s Ex. 2. She received a salary of $55,000 per year plus full benefits.[50] 7-8-19 Tr. I at 93;

Def.'s Ex. 2.

346.    The plaintiff is now at Montgomery County Community College as its director of

the Trio Upward Bound Program. 7-8-19 Tr. I at 93. She receives a salary of $60,000 per year plus

full benefits. *Id.*

347.    The plaintiff seeks the following damages for lost wages from 2017 to 2019: (1) for

2017 - $90,420; (2) for 2018 - $92,906; and (3) for 2019 - $95,460. Pl.'s Pretrial Mem. at 6, Doc.

No. 21. The plaintiff also seeks attorney's fees and costs. *Id.* at 7.

348.    After observing the demeanor and hearing the testimony of Dr. Odi, Ms. Forrest,

Ms. Zavalydriga, Dr. Outing, Mr. Halladay, Attorney Salvemini, Dr. Stanlick, Ms. Mann, Ms.

Lefever, and Provost Farrell, the court finds their testimony credible. Having observed the

demeanor and heard the testimony of the plaintiff, to the extent that the plaintiff's testimony is

contradicted by the other testimony and evidence in the record (and as described earlier in this

opinion), the court does not find her testimony credible.

### III.    CONCLUSIONS OF LAW

1.    This court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.

2.    This court has personal jurisdiction over Lehigh.

3.    Venue is proper in this court under 28 U.S.C. § 1391(a)(1), (2).

4.    The plaintiff alleges that Lehigh violated Title VII of the Civil Rights Act of 1964,

as amended, 42 U.S.C. § 2000e-2(a)(1), by discriminating against her on the basis of her race and

gender.

---

[50] In her pretrial memorandum, the plaintiff asserts that she earned approximately $36,750 as deputy CEO. Pl.'s
Pretrial Mem. at 7.

5.      Although the plaintiff included a reference in her complaint to the ADEA, *see* Compl. at ¶ 1 (referencing 29 U.S.C. § 623(a)(1)), her counsel indicated during the initial pretrial conference that she was not prosecuting such a claim and, other than that single reference to the ADEA, there are no factual allegations that Lehigh discriminated against her on the basis of her age in the complaint. Despite the representation of the plaintiff's counsel that the plaintiff was not proceeding for any alleged violation of the ADEA, the plaintiff again included a reference to this Act in her proposed findings of fact and conclusions of law.[51] *See* Pl.'s Findings and Conclusions at ECF p. 9. Despite this reference, the court concludes that she did not plead a plausible ADEA claim or otherwise state a claim for an ADEA violation upon which relief could be granted.

6.      Nonetheless, to the extent that the plaintiff is possibly asserting an ADEA claim, she failed to introduce any evidence, much less demonstrate by a preponderance of the evidence, that Lehigh discriminated against her on the basis of her age or created a hostile work environment due to her age.

7.      The plaintiff also alleges that she was constructively discharged as a result of the race-based and sex-based hostile environment to which Lehigh subjected her.

8.      Regarding Title VII, it is unlawful for any employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

9.      The plaintiff alleges that Lehigh and numerous individuals at Lehigh, including Dr. Odi, Ms. Forrest, Dr. Stanlick, and Mr. Halladay, subjected her to a race- and gender-based hostile work environment.

---

[51] On an even more confusing note, the plaintiff requests that the court enter judgment in her favor on "Counts I and II" of the complaint, *see* Pl.'s Findings and Conclusions at ECF p. 12, yet, the complaint does not contain any counts.

10.     Regarding the plaintiff's Title VII claim, to prevail on this claim "the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her sex [or race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." *Mandel v. M & Q Packaging Corp.* 706 F.3d 157, 167 (3d Cir. 2013); *see also* 3d Cir. Model Jury Instructions § 5.1.4.

11.     "To establish hostile work environment, plaintiffs . . . must show harassing behavior 'sufficiently severe or pervasive to alter the conditions of [their] employment.'" *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (alteration in original)).

12.     In addition,

> [c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993).

13.     The court must review all the circumstances when determining whether an environment is hostile or abusive, which "may include frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.[52]

---

[52] The Model Instructions for the Third Circuit indicate:

> In determining whether a work environment is "hostile" you must look at all of the circumstances, which may include:

14.     "[T]o establish 'constructive discharge,' the plaintiff must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Suders*, 542 U.S. at 134; *see also* 3d Cir. Model Jury Instructions § 5.2.2 ("To prove that [he/she] was subjected to a constructive discharge, [plaintiff] must prove that working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign.").

---

• The total physical environment of [plaintiff's] work area.
• The degree and type of language and insult that filled the environment before and after [plaintiff] arrived.
• The reasonable expectations of [plaintiff] upon entering the environment.
• The frequency of the offensive conduct.
• The severity of the conduct.
• The effect of the working environment on [plaintiff's] mental and emotional well-being.
• Whether the conduct was unwelcome, that is, conduct [plaintiff] regarded as unwanted or unpleasant.
• Whether the conduct was pervasive.
• Whether the conduct was directed toward [plaintiff].
• Whether the conduct was physically threatening or humiliating.
• Whether the conduct was merely a tasteless remark.
• Whether the conduct unreasonably interfered with [plaintiff's] work performance.

Conduct that amounts only to ordinary socializing in the workplace, such as occasional horseplay, occasional use of abusive language, tasteless jokes, and occasional teasing, does not constitute an abusive or hostile work environment. A hostile work environment can be found only if there is extreme conduct amounting to a material change in the terms and conditions of employment. Moreover, isolated incidents, unless extremely serious, will not amount to a hostile work environment.

It is not enough that the work environment was generally harsh, unfriendly, unpleasant, crude or vulgar to all employees. In order to find a hostile work environment, you must find that [plaintiff] was harassed because of [plaintiff's membership in a protected class]. The harassing conduct may, but need not be [sexual/racial, etc.] in nature. Rather, its defining characteristic is that the harassment complained of is linked to the victim's [protected status]. The key question is whether [plaintiff], as a [member of protected class], was subjected to harsh employment conditions to which [those outside the protected class] were not.

It is important to understand that, in determining whether a hostile work environment existed at the [employer's workplace] you must consider the evidence from the perspective of a reasonable [member of protected class] in the same position. That is, you must determine whether a reasonable [member of protected class] would have been offended or harmed by the conduct in question. You must evaluate the total circumstances and determine whether the alleged harassing behavior could be objectively classified as the kind of behavior that would seriously affect the psychological or emotional well-being of a reasonable [member of protected class]. The reasonable [member of protected class] is simply one of normal sensitivity and emotional make-up.

3d Cir. Model Jury Instruction § 5.2.1.

15.    In determining whether there was a constructive discharge, the court "employ[s] an objective test and thus an employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge." *Mandel*, 706 F.3d at 169 (citing *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (3d Cir. 1992)).

16.    "In determining whether an employee was forced to resign, [the court] consider[s] a number of factors, including whether the employee was threatened with discharge, encouraged to resign, demoted, subject to reduced pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations." *Mandel*, 706 F.3d at 169–70 (citing *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010)).

17.    An employer defending against a constructive discharge claim may do so "by showing both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus." *Suders*, 542 U.S. at 134. This is an affirmative defense, and it is unavailable to the employer "if the plaintiff quits in reasonable response to an employer-sanctioned adverse action officially changing her employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions." *Id.*; *see Faragher v. Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). Thus, a constructive discharge constitutes a "tangible employment action" only "when a supervisor's official act precipitates the constructive discharge." *Id.* at 140–41.

18.    Based on all the evidence, the plaintiff has not proven, by a preponderance of the evidence, that she was subjected to a hostile working environment. In particular, the plaintiff has not proven by a preponderance of the evidence that, *inter alia* (1) she suffered intentional

discrimination because of her race or sex, (2) even if there was any discrimination, that it was severe **or** pervasive, and (3) even if there was discrimination, that it would detrimentally affect a reasonable person in similar circumstances.

19.     Based on all the evidence, the plaintiff has not proven, by a preponderance of the evidence, that she was constructively discharged.

20.     Based on all the evidence, to the extent that the plaintiff alleges and asserts that she was constructively discharged based on her supervisor's or co-worker's adverse action or actions that Lehigh did not sanction, Lehigh has proven, by a preponderance of the evidence, the *Faragher/Ellerth* affirmative defense in that (1) it has a comprehensive anti-discrimination policy, which it makes known to the Lehigh Community, and of which the plaintiff was aware, (2) it has an active and viable complaint and investigation procedure through its Equal Opportunity Compliance Coordinator, (3) it exercised reasonable care to prevent and correct any race- or gender-based harassment, and (4) the plaintiff failed to take advantage of such preventive or corrective opportunities or avoid harm otherwise.

21.     Although the plaintiff indicated in her pretrial memorandum and proposed findings of fact and conclusions of law that she was asserting a constructive discharge claim under Pennsylvania law, *see* Pl.'s Pretrial Mem. at 1; Pl.'s Findings and Conclusions at ECF p. 9, she did include any such claim in the complaint and never sought leave to amend her complaint and therefore is not entitled to relief for any such cause of action. Nonetheless, even if she did assert such a claim, she has not proven by a preponderance of the evidence that she was constructively discharged under Pennsylvania law. *See Helpin v. Trustees of Univ. of Pa.*, 969 A.2d 601, 614 (Pa. Super. 2009) ("This Court has held that '[c]onstructive discharge of an at-will employee may serve as a basis for tort recovery if the employer has made working conditions so intolerable that an

employee has been forced to resign.'" (quoting *Highhouse v. Avery Transp.*, 660 A.2d 1374, 1376

(Pa. Super. 1995).[53]

      22.     Lehigh is entitled to judgment in its favor.

The court will enter a separate order and judgment.

BY THE COURT:

*/s/ Edward G. Smith*_____
EDWARD G. SMITH, J.

---

[53] In *Helpin*, the court explained that

> In this context, "[i]ntolerability ... is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign, that is, whether he would have had no choice but to resign." *Connors v. Chrysler Financial Corp.*, 160 F.3d 971, 976 (3d Cir.1998). It may not be premised upon the conclusion that resignation was the wisest or best decision under the circumstances, nor is it established based on an employee's subjective judgment. *See id.*

969 A.2d at 614.